# FRANKS *v.* DELAWARE

No. 77–5176.   Argued February 27, 1978—Decided June 26, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined, REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 180.

*Donald W. Huntley* argued the cause and filed briefs for petitioner.

*Harrison F. Turner,* Deputy Attorney General of Delaware, argued the cause for respondent. With him on the brief was *Richard R. Wier, Jr.,* Attorney General.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents an important and longstanding issue of Fourth Amendment law. Does a defendant in a criminal proceeding ever have the right, under the Fourth and Fourteenth Amendments, subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant?

In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant. We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

---

*Briefs of *amici curiae* were filed by *Solicitor General McCree, Assistant Attorney General Civiletti, Kenneth S. Geller, Jerome M. Feit,* and *Paul J. Brysh* for the United States, and by *Bruce J. Ennis* for the American Civil Liberties Union.

included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

I

The controversy over the veracity of the search warrant affidavit in this case arose in connection with petitioner Jerome Franks' state conviction for rape, kidnaping, and burglary. On Friday, March 5, 1976, Mrs. Cynthia Bailey told police in Dover, Del., that she had been confronted in her home earlier that morning by a man with a knife, and that he had sexually assaulted her. She described her assailant's age, race, height, build, and facial hair, and gave a detailed description of his clothing as consisting of a white thermal undershirt, black pants with a silver or gold buckle, a brown leather three-quarter-length coat, and a dark knit cap that he wore pulled down around his eyes.

That same day, petitioner Franks coincidentally was taken into custody for an assault involving a 15-year-old girl, Brenda B. ——, six days earlier. After his formal arrest, and while awaiting a bail hearing in Family Court, petitioner allegedly stated to Robert McClements, the youth officer accompanying him, that he was surprised the bail hearing was "about Brenda B. ——. I know her. I thought you said Bailey. I don't know her." Tr. 175, 186. At the time of this statement, the police allegedly had not yet recited to petitioner his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

On the following Monday, March 8, Officer McClements happened to mention the courthouse incident to a detective, Ronald R. Brooks, who was working on the Bailey case. Tr. 186, 190–191. On March 9, Detective Brooks and Detective Larry D. Gray submitted a sworn affidavit to a Justice of the Peace in Dover, in support of a warrant to search petitioner's apartment.[1] In paragraph 8 of the affidavit's "probable cause page" mention was made of petitioner's statement to McClements. In paragraph 10, it was noted that the description of the assailant given to the police by Mrs. Bailey included the above-mentioned clothing. Finally, the affidavit also described the attempt made by police to confirm that petitioner's typical outfit matched that of the assailant. Paragraph 15 recited: "On Tuesday, 3/9/76, your affiant contacted Mr. James Williams and Mr. Wesley Lucas of the Delaware Youth Center where Jerome Franks is employed and did have personal conversation with both these people." Paragraphs 16 and 17 respectively stated: "Mr. James Williams revealed to your affiant that the normal dress of Jerome Franks does consist of a white knit thermal undershirt and a brown leather jacket," and "Mr. Wesley Lucas revealed to your affiant that in addition to the thermal undershirt and jacket, Jerome Franks often wears a dark green knit hat."

The warrant was issued on the basis of this affidavit. App. 9. Pursuant to the warrant, police searched petitioner's apartment and found a white thermal undershirt, a knit hat, dark pants, and a leather jacket, and, on petitioner's kitchen table, a single-blade knife. All these ultimately were introduced in evidence at trial.

Prior to the trial, however, petitioner's counsel filed a written motion to suppress the clothing and the knife found in the search; this motion alleged that the warrant on its face did not show probable cause and that the search and seizure were

---

[1] The affidavit is reproduced as Appendix A to this opinion. *Post,* at 172.

in violation of the Fourth and Fourteenth Amendments. *Id.*, at 11–12. At the hearing on the motion to suppress, defense counsel orally amended the challenge to include an attack on the veracity of the warrant affidavit; he also specifically requested the right to call as witnesses Detective Brooks, Wesley Lucas of the Youth Center, and James D. Morrison, formerly of the Youth Center.[2] *Id.*, at 14–17. Counsel asserted that Lucas and Morrison would testify that neither had been personally interviewed by the warrant affiants, and that, although they might have talked to another police officer, any information given by them to that officer was "somewhat different" from what was recited in the affidavit. *Id.*, at 16. Defense counsel charged that the misstatements were included in the affidavit not inadvertently, but in "bad faith." *Id.*, at 25. Counsel also sought permission to call Officer McClements and petitioner as witnesses, to seek to establish that petitioner's courthouse statement to police had been obtained in violation of petitioner's *Miranda* rights, and that the search warrant was thereby tainted as the fruit of an illegally obtained confession. *Id.*, at 17, 27.

In rebuttal, the State's attorney argued in detail, App. 15–24, (a) that Del. Code Ann., Tit. 11, §§ 2306, 2307 (1974), contemplated that any challenge to a search warrant was to be limited to questions of sufficiency based on the face of the affidavit; (b) that, purportedly, a majority of the States whose

---

[2] The references in paragraphs 15 and 16 of the warrant affidavit's probable-cause page to "James Williams" appear to have been intended as references to James D. Morrison, who was petitioner's supervisor at the Youth Center. Tr. 269. This misapprehension on the part of the State continued until shortly before trial. Eleven days prior to trial, the prosecution requested the Clerk of the Kent County Superior Court to summon "James Williams, Delaware Youth Center," for petitioner's trial. In his return on the summons, Record Doc. No. 16, the Kent County Sheriff stated that he "[s]erved the within summons upon . . . James Williams (Morrison)." The summons actually delivered was made out in the name of James Morrison.

practice was not dictated by statute observed such a rule; [3] and (c) that federal cases on the issue were to be distinguished because of Fed. Rule Crim. Proc. 41 (e).[4]  He also noted that

---

[3] It appears this is no longer the majority rule among the States.  Compare Comment, 7 Seton Hall L. Rev. 827, 844 (1976) (about half of the States have addressed the issue, and the weight of authority is "slightly in favor" of permitting veracity challenges), with *North Carolina* v. *Wrenn,* 417 U. S. 973 (1974) (WHITE, J., dissenting from denial of certiorari) (majority of state decisions prohibit subsequent impeachment of an affidavit).

By our count, 19 States, and perhaps as many as 21, permit veracity challenges; 5 of these apparently rely on statutory provisions in so holding. Five States have disposed of particular veracity challenges on the ground there was no misstatement, or that any misstatement was immaterial or unintentional, without opining what would be done when there is a deliberate and material misrepresentation.  There are now only 11 States that prohibit veracity challenges outright.  Another two have barred impeachment challenges that seemed directed at the conclusory nature of affidavit allegations rather than at their veracity.

The case law is detailed in Appendix B.  *Post,* at 176.

[4] This reasoning is misplaced.  The Federal Courts of Appeals decisions allowing a defendant to challenge the veracity of a warrant affidavit rest on a constitutional footing.  See *United States* v. *Belculfine,* 508 F. 2d 58, 61, 63 (CA1 1974); *United States* v. *Dunnings,* 425 F. 2d 836, 839–840 (CA2 1969), cert. denied, 397 U. S. 1002 (1970); *United States* v. *Armocida,* 515 F. 2d 29, 41 (CA3), cert. denied *sub nom. Gazal* v. *United States,* 423 U. S. 858 (1975); *United States* v. *Lee,* 540 F. 2d 1205, 1208–1209 (CA4), cert. denied, 429 U. S. 894 (1976); *United States* v. *Thomas,* 489 F. 2d 664, 668, 671 (CA5 1973), cert. denied, 423 U. S. 844 (1975); *United States* v. *Luna,* 525 F. 2d 4, 8 (CA6 1975), cert. denied, 424 U. S. 965 (1976); *United States* v. *Carmichael,* 489 F. 2d 983, 988–989 (CA7 1973) (en banc); *United States* v. *Marihart,* 492 F. 2d 897, 898 (CA8), cert. denied, 419 U. S. 827 (1974); *United States* v. *Damitz,* 495 F. 2d 50, 54–56 (CA9 1974); *United States* v. *Harwood,* 470 F. 2d 322, 324–325 (CA10 1972).

Of all the Federal Courts of Appeals, only one now apparently refrains from permitting challenges to affidavit veracity.  See *United States* v. *Watts,* 176 U. S. App. D. C. 314, 317–318 n. 5, 540 F. 2d 1093, 1096–1097 n. 5 (1976); *United States* v. *Branch,* 178 U. S. App. D. C. 99, 102 n. 2, 545 F. 2d 177, 180 n. 2 (1976).

this Court had reserved the general issue of subfacial challenge to veracity in *Rugendorf* v. *United States,* 376 U. S. 528, 531–532 (1964), when it disposed of that case on the ground that, even if a veracity challenge were permitted, the alleged factual inaccuracies in that case's affidavit "were of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit." *Id.,* at 532. The State objected to petitioner's "going behind [the warrant affidavit] in any way," and argued that the court must decide petitioner's motion "on the four corners" of the affidavit. App. 21.

The trial court sustained the State's objection to petitioner's proposed evidence. *Id.,* at 25, 27. The motion to suppress was denied, and the clothing and knife were admitted as evidence at the ensuing trial. Tr. 192–196. Petitioner was convicted. In a written motion for judgment of acquittal and/or new trial, Record Doc. No. 23, petitioner repeated his objection to the admission of the evidence, stating that he "should have been allowed to impeach the Affidavit used in the Search Warrant to show purposeful misrepresentation of information contained therein." *Id.,* at 2. The motion was denied, and petitioner was sentenced to two consecutive terms of 25 years each and an additional consecutive life sentence.

On appeal, the Supreme Court of Delaware affirmed. 373 A. 2d 578 (1977). It agreed with what it deemed to be the "majority rule" that no attack upon the veracity of a warrant affidavit could be made:

> "We agree with the majority rule for two reasons. First, it is the function of the issuing magistrate to determine the reliability of information and credibility of affiants in deciding whether the requirement of probable cause has been met. There has been no need demonstrated for interfering with this function. Second, neither the probable cause nor suppression hearings are adjudications of guilt or innocence; the matters asserted by defendant are

more properly considered in a trial on the merits." *Id.,* at 580.

Because of this resolution, the Delaware Supreme Court noted that there was no need to consider petitioner's "other contentions, relating to the evidence that would have been introduced for impeachment purposes." *Ibid.*

Franks' petition for certiorari presented only the issue whether the trial court had erred in refusing to consider his allegation of misrepresentation in the warrant affidavit.[5] Because of the importance of the question, and because of the conflict among both state and federal courts, we granted certiorari. 434 U. S. 889 (1977).

## II

It may be well first to note how we are compelled to reach the Fourth Amendment issue proffered in this case. In particular, the State's proposals of an independent and adequate state ground and of harmless error do not dispose of the controversy.

Respondent argues that petitioner's trial counsel, who is not the attorney representing him in this Court, failed to include the challenge to the veracity of the warrant affidavit in the written motion to suppress filed before trial, contrary to the requirement of Del. Super. Ct. Rule Crim. Proc. 41 (e) that a motion to suppress "shall state the grounds upon which it is made." The Supreme Court of Delaware, however, disposed of petitioner's Fourth Amendment claim on the merits. A ruling on the merits of a federal question by the highest state court leaves the federal question open to review

---

[5] Franks did not raise in his petition the issue of his *Miranda* challenge to the courthouse statement given to police and the use of that statement in the warrant affidavit. The propriety of the trial court's refusal to hear testimony on that subject is therefore not before us. It also appears that Franks did not take that issue to the Supreme Court of Delaware. See Opening Brief for Appellant, No. 259, 1976 (Del. Sup. Ct.).

in this Court. *Manhattan Life Ins. Co.* v. *Cohen,* 234 U. S. 123, 134 (1914); *Raley* v. *Ohio,* 360 U. S. 423, 436–437 (1959); *Boykin* v. *Alabama,* 395 U. S. 238, 241–242 (1969).

Respondent next suggests that any error here was harmless. Assuming, *arguendo,* respondent says, that petitioner's Fourth Amendment claim was valid, and that the warrant should have been tested for veracity and the evidence excluded, it is still clear beyond a reasonable doubt that the evidence complained of did not contribute to petitioner's conviction. *Chambers* v. *Maroney,* 399 U. S. 42, 52–53 (1970). This contention falls of its own weight. The sole issue at trial was that of consent. Petitioner admitted, App. 37, that he had engaged in sexual relations with Mrs. Bailey on the day in question. She testified, Tr. 50–51, 69–70, that she had not consented to this, and that petitioner, upon first encountering her in the house, had threatened her with a knife to force her to submit. Petitioner claimed that she had given full consent and that no knife had been present. *Id.,* at 254, 271. To corroborate its contention that consent was lacking, the State introduced in evidence a stainless steel, wooden-handled kitchen knife found by the detectives on the kitchen table in petitioner's apartment four days after the alleged rape. *Id.,* at 195–196; Magistrate's Return on the Search Warrant March 9, 1976, Record Doc. No. 23. Defense counsel objected to its admission, arguing that Mrs. Bailey had not given any detailed description of the knife alleged to be involved in the incident and had claimed to have seen the knife only in "pitch blackness." Tr. 195. The State obtained its admission, however, as a knife that matched the description contained in the search warrant, and Mrs. Bailey testified that the knife allegedly used was, like the knife in evidence, single-edged and not a pocket knife, and that the knife in evidence was the same length and thickness as the knife used in the crime. *Id.,* at 69, 114–115. The State carefully elicited from Detective Brooks the fact that this was the only knife found in petitioner's

apartment. *Id.,* at 196. Although respondent argues that the knife was presented to the jury as "merely exemplary of the generic class of weapon testimonially described by the victim," Brief for Respondent 15–16, the State at trial clearly meant to suggest that this was the knife that had been used against Mrs. Bailey. Had the warrant been quashed, and the knife excluded from the trial as evidence, we cannot say with any assurance that the jury would have reached the same decision on the issue of consent, particularly since there was countervailing evidence on that issue.

We should note, in addition, why this case cannot be treated as was the situation in *Rugendorf* v. *United States.* There the Court held that no Fourth Amendment question was presented when the claimed misstatements in the search warrant affidavit "were of only peripheral relevancy to the showing of probable cause, *and,* not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit." 376 U. S., at 532 (emphasis added). *Rugendorf* emphasized that the "erroneous statements . . . were not those of the affiant" and thus "fail[ed] to show that the affiant was in bad faith or that he made any misrepresentations to the Commissioner in securing the warrant." *Id.,* at 533.[6] Here,

---

[6] The *Rugendorf* affidavit, sworn to by FBI Special Agent Moore, contained two alleged inaccuracies: a double hearsay statement that petitioner Samuel Rugendorf was the manager of Rugendorf Brothers Meat Market, and a double hearsay statement that he was associated with his brother, Leo, in the meat business. As to the second, the affidavit stated that a confidential informant told FBI Special Agent McCormick about the Rugendorf brothers' association, and McCormick told affiant Moore. As to the first, the affidavit stated that the information was given by Chicago Police Officer Kelleher to Special Agent McCormick, who in turn relayed it to affiant Moore. Kelleher testified that he did not so inform McCormick, but the petitioner in *Rugendorf* had failed to pursue the discrepancy: He did not seek a deposition from McCormick, who was in the hospital at the time of trial, and did not seek a postponement to enable McCormick to be present. 376 U. S., at 533 n. 4. In characterizing the affidavit in *Rugendorf* as raising no question of integrity, the Court took as its premise

164

whatever the judgment may be as to the relevancy of the alleged misstatements, the integrity of the affidavit was directly placed in issue by petitioner in his allegation that the affiants did not, as claimed, speak directly to Lucas and Morrison. Whether such conversations took place is surely a matter "within the personal knowledge of the affiant[s]." We also might note that although respondent's brief puts forth that the alleged misrepresentations in the affidavit were of little importance in establishing probable cause, Brief for Respondent 16, respondent at oral argument appeared to disclaim any reliance on *Rugendorf.* Tr. of Oral Arg. 30.

## III

Whether the Fourth and Fourteenth Amendments, and the derivative exclusionary rule made applicable to the States under *Mapp* v. *Ohio,* 367 U. S. 643 (1961), ever mandate that a defendant be permitted to attack the veracity of a warrant affidavit after the warrant has been issued and executed, is a question that encounters conflicting values. The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search. In deciding today that, in certain circumstances, a challenge to a warrant's veracity must be permitted, we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." Judge Frankel, in *United States* v. *Halsey,* 257 F. Supp. 1002, 1005 (SDNY 1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put the matter simply: "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a

that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.

*truthful* showing" (emphasis in original). This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law, see *Nathanson* v. *United States,* 290 U. S. 41, 47 (1933); *Giordenello* v. *United States,* 357 U. S. 480, 485–486 (1958); *Aguilar* v. *Texas,* 378 U. S. 108, 114–115 (1964), that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of information, the affidavit must recite "some of the underlying circumstances from which the informant concluded" that relevant evidence might be discovered, and "some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, . . . was 'credible' or his information 'reliable.'" *Id.,* at 114. Because it is the magistrate who must determine independently whether there is probable cause, *Johnson* v. *United States,* 333 U. S. 10, 13–14 (1948); *Jones* v. *United States,* 362 U. S. 257, 270–271 (1960), it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.

In saying this, however, one must give cognizance to competing values that lead us to impose limitations. They perhaps can best be addressed by noting the arguments of respondent and others against allowing veracity challenges. The arguments are several:

First, respondent argues that the exclusionary rule, created in *Weeks* v. *United States,* 232 U. S. 383 (1914), is not a

personal constitutional right, but only a judicially created remedy extended where its benefit as a deterrent promises to outweigh the societal cost of its use; that the Court has declined to apply the exclusionary rule when illegally seized evidence is used to impeach the credibility of a defendant's testimony, *Walder* v. *United States,* 347 U. S. 62 (1954), is used in a grand jury proceeding, *United States* v. *Calandra,* 414 U. S. 338 (1974), or is used in a civil trial, *United States* v. *Janis,* 428 U. S. 433 (1976); and that the Court similarly has restricted application of the Fourth Amendment exclusionary rule in federal habeas corpus review of a state conviction. See *Stone* v. *Powell,* 428 U. S. 465 (1976). Respondent argues that applying the exclusionary rule to another situation—the deterrence of deliberate or reckless untruthfulness in a warrant affidavit—is not justified for many of the same reasons that led to the above restrictions; interfering with a criminal conviction in order to deter official misconduct is a burden too great to impose on society.

Second, respondent argues that a citizen's privacy interests are adequately protected by a requirement that applicants for a warrant submit a sworn affidavit and by the magistrate's independent determination of sufficiency based on the face of the affidavit. Applying the exclusionary rule to attacks upon veracity would weed out a minimal number of perjurious government statements, says respondent, but would overlap unnecessarily with existing penalties against perjury, including criminal prosecutions, departmental discipline for misconduct, contempt of court, and civil actions.

Third, it is argued that the magistrate already is equipped to conduct a fairly vigorous inquiry into the accuracy of the factual affidavit supporting a warrant application. He may question the affiant, or summon other persons to give testimony at the warrant proceeding. The incremental gain from a post-search adversary proceeding, it is said, would not be great.

Fourth, it is argued that it would unwisely diminish the solemnity and moment of the magistrate's proceeding to make his inquiry into probable cause reviewable in regard to veracity. The less final, and less deference paid to, the magistrate's determination of veracity, the less initiative will he use in that task. Denigration of the magistrate's function would be imprudent insofar as his scrutiny is the last bulwark preventing any particular invasion of privacy before it happens.

Fifth, it is argued that permitting a post-search evidentiary hearing on issues of veracity would confuse the pressing issue of guilt or innocence with the collateral question as to whether there had been official misconduct in the drafting of the affidavit. The weight of criminal dockets, and the need to prevent diversion of attention from the main issue of guilt or innocence, militate against such an added burden on the trial courts. And if such hearings were conducted routinely, it is said, they would be misused by defendants as a convenient source of discovery. Defendants might even use the hearings in an attempt to force revelation of the identity of informants.

Sixth and finally, it is argued that a post-search veracity challenge is inappropriate because the accuracy of an affidavit in large part is beyond the control of the affiant. An affidavit may properly be based on hearsay, on fleeting observations, and on tips received from unnamed informants whose identity often will be properly protected from revelation under *McCray* v. *Illinois,* 386 U. S. 300 (1967).

None of these considerations is trivial. Indeed, because of them, the rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded. But neither do the considerations cited by respondent and others have a fully controlling weight; we conclude that they are insufficient to justify an *absolute* ban on post-search impeachment of veracity. On this side of the balance, also, there are pressing considerations:

First, a flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning. The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile. It is this specter of intentional falsification that, we think, has evoked such widespread opposition to the flat nonimpeachment rule from the commentators,[7] from the American Law Institute in its Model Code of Pre-Arraignment Procedure, § SS290.3 (1) (Prop. Off. Draft 1975), from the federal courts of appeals, and from state courts. On occasion, of course, an instance of deliberate falsity will be exposed and confirmed without a special inquiry either at trial, see *United States ex rel. Petillo* v. *New Jersey,* 400 F. Supp. 1152, 1171–1172 (NJ 1975), vacated and remanded by order *sub nom. Albanese* v. *Yeager,* 541 F. 2d 275 (CA3 1976), or at a hearing on the sufficiency of the affidavit, cf. *United States* v. *Upshaw,* 448 F. 2d 1218, 1221–1222

---

[7] Mascolo, Impeaching the Credibility of Affidavits for Search Warrants: Piercing the Presumption of Validity, 44 Conn. Bar J. 9, 19, 25–28 (1970); Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv. L. Rev. 825, 830–832 (1971); Grano, A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury, 1971 U. Ill. Law Forum 405, 456; Forkosh, The Constitutional Right to Challenge the Content of Affidavits in Warrants Issued Under the Fourth Amendment, 34 Ohio St. L. J. 297, 306, 308, 340 (1973); Sevilla, The Exclusionary Rule and Police Perjury, 11 San Diego L. Rev. 839, 869 (1974); Herman, Warrants for Arrest or Search: Impeaching the Allegations of a Facially Sufficient Affidavit, 36 Ohio St. L. J. 721, 738–739, 750 (1975); Note, 15 Buffalo L. Rev. 712, 716–717 (1966); Note, 51 Cornell L. Q. 822, 825–826 (1966); Note, 34 Ford. L. Rev. 740, 745 (1966); Note, 67 Colum. L. Rev. 1529, 1530–1531 (1967); Comment, 19 UCLA L. Rev. 96, 108, 146 (1971); Comment, 63 J. Crim. L., C. & P. S. 41, 48, 50 (1972); Note, 23 Drake L. Rev. 623, 638–639 (1974); Comment, 7 Seton Hall L. Rev. 827, 859–860 (1976).

(CA5 1971), cert. denied, 405 U. S. 934 (1972). A flat non-impeachment rule would bar re-examination of the warrant even in these cases.

Second, the hearing before the magistrate not always will suffice to discourage lawless or reckless misconduct. The pre-search proceeding is necessarily *ex parte,* since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an extended independent examination of the affiant or other witnesses.

Third, the alternative sanctions of a perjury prosecution, administrative discipline, contempt, or a civil suit are not likely to fill the gap. *Mapp* v. *Ohio* implicitly rejected the adequacy of these alternatives. Mr. Justice Douglas noted this in his concurrence in *Mapp,* 367 U. S., at 670, where he quoted from *Wolf* v. *Colorado,* 338 U. S. 25, 42 (1949): " 'Self-scrutiny is a lofty ideal, but its exaltation reaches new heights if we expect a District Attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered.' "

Fourth, allowing an evidentiary hearing, after a suitable preliminary proffer of material falsity, would not diminish the importance and solemnity of the warrant-issuing process. It is the *ex parte* nature of the initial hearing, rather than the magistrate's capacity, that is the reason for the review. A magistrate's determination is presently subject to review before trial as to *sufficiency* without any undue interference

with the dignity of the magistrate's function. Our reluctance today to extend the rule of exclusion beyond instances of deliberate misstatements, and those of reckless disregard, leaves a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination.

Fifth, the claim that a post-search hearing will confuse the issue of the defendant's guilt with the issue of the State's possible misbehavior is footless. The hearing will not be in the presence of the jury. An issue extraneous to guilt already is examined in any probable-cause determination or review of probable cause. Nor, if a sensible threshold showing is required and sensible substantive requirements for suppression are maintained, need there be any new large-scale commitment of judicial resources; many claims will wash out at an early stage, and the more substantial ones in any event would require judicial resources for vindication if the suggested alternative sanctions were truly to be effective. The requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction. And because we are faced today with only the question of the integrity of the affiant's representations as to his own activities, we need not decide, and we in no way predetermine, the difficult question whether a reviewing court must ever require the revelation of the identity of an informant once a substantial preliminary showing of falsity has been made. *McCray* v. *Illinois,* 386 U. S. 300 (1967), the Court's earlier disquisition in this area, concluded only that the Due Process Clause of the Fourteenth Amendment did not require the State to expose an informant's identity routinely, upon a defendant's mere demand, when there was ample evidence in the probable-cause hearing to show that the informant was reliable and his information credible.

Sixth and finally, as to the argument that the exclusionary

rule should not be extended to a "new" area, we cannot regard any such extension really to be at issue here. Despite the deep skepticism of Members of this Court as to the wisdom of extending the exclusionary rule to collateral areas, such as civil or grand jury proceedings, the Court has not questioned, in the absence of a more efficacious sanction, the continued application of the rule to suppress evidence from the State's case where a Fourth Amendment violation has been substantial and deliberate. See *Brewer* v. *Williams,* 430 U. S. 387, 422 (1977) (BURGER, C. J., dissenting); *Stone* v. *Powell,* 428 U. S., at 538 (WHITE, J., dissenting). We see no principled basis for distinguishing between the question of the sufficiency of an affidavit, which also is subject to a post-search re-examination, and the question of its integrity.

## IV

In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental inform-ant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless

disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.[8] On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Because of Delaware's absolute rule, its courts did not have occasion to consider the proffer put forward by petitioner Franks. Since the framing of suitable rules to govern proffers is a matter properly left to the States, we decline ourselves to pass on petitioner's proffer. The judgment of the Supreme Court of Delaware is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

## APPENDIX A TO OPINION OF THE COURT

J. P. COURT #7

IN THE MATTER OF: Jerome Franks, B/M, DOB: 10/9/54 and 222 S. Governors Ave., Apt. #3, Dover, Delaware. A two room apartment located on the South side, second floor, of a white block building on the west side of S. Governors Avenue, Between Loockerman Street and North Street, in the City of Dover. The ground floor of this building houses Wayman's Barber Shop.

STATE OF DELAWARE }
COUNTY OF KENT } ss:

Be it remembered that on this 9th day of March A. D.

---

[8] Petitioner conceded that if what is left is sufficient to sustain probable cause, the inaccuracies are irrelevant. Tr. of Oral Arg. 3, 13. Petitioner also conceded that if the warrant affiant had no reason to believe the information was false, there was no violation of the Fourth Amendment. *Id.,* at 16–17.

1976 before me John Green, personally appeared Det. Ronald R. Brooks and Det. Larry Gray of the Dover Police Department who being by me duly sworn depose and say:

That they have reason to believe and do believe that in the 222 S. Governors Avenue, Apartment #3, Dover, Delaware. A two room apartment located on the south side second floor of a white block building on the west side of S. Governors Avenue between Loockerman Street and North Street in the City of Dover. The ground floor of this building houses Wayman's Barber Shop the occupant of which is Jerome Franks there has been and/or there is now located and/or concealed certain property in said house, place, conveyance and/or on the person or persons of the occupants thereof, consisting of property, papers, articles, or things which are the instruments of criminal offense, and/or obtained in the commission of a crime, and/or designated to be used in the commission of a crime, and not reasonably calculated to be used for any other purpose and/or the possession of which is unlawful, papers, articles, or things which are of an evidentiary nature pertaining to the commission of a crime or crimes specified therein and in particular, a white knit thermal undershirt; a brown ¾ length leather jacket with a tie-belt; a pair of black mens pants; a dark colored knit hat; a long thin bladed knife or other instruments or items relating to the crime.

Articles, or things were, are, or will be possessed and/or used in violation of Title 11, Sub-Chapter D, Section 763, Delaware Code in that [see attached probable-cause page].

Wherefore, affiants pray that a search warrant may be issued authorizing a search of the aforesaid 222 S. Governors Avenue, Apartment #3, Dover, Delaware. A two room apartment located on the south side second floor of a white block building on the west side of S. Governors Avenue

between Loockerman St. and North Street, in the City of Dover in the manner provided by law.

/s/ Det. Ronald R. Brooks
Affiant
/s/ Det. Larry D. Gray
Affiant

SWORN to (or affirmed) and subscribed before me this 9th day of March A. D. 1976.

/s/ John [illegible] Green
Judge Ct 7

The facts tending to establish probable cause for the issuance of this search warrant are:

1. On Saturday, 2/28/76, Brenda L. B. ——, W/F/15, reported to the Dover Police Department that she had been kidnapped and raped.

2. An investigation of this complaint was conducted by Det. Boyce Failing of the Dover Police Department.

3. Investigation of the aforementioned complaint revealed that Brenda B. ——, while under the influence of drugs, was taken to 222 S. Governors Avenue, Apartment 3, Dover, Delaware.

4. Investigation of the aforementioned complaint revealed that 222 S. Governors Avenue, Apartment #3, Dover, Delaware, is the residence of Jerome Franks, B/M DOB: 10/9/54.

5. Investigation of the aforementioned complaint revealed that on Saturday, 2/2[8]/76, Jerome Franks did have sexual contact with Brenda B. —— without her consent.

6. On Thursday, 3/4/76 at the Dover Police Department, Brenda B. —— revealed to Det. Boyce Failing that Jerome Franks was the person who committed the Sexual Assault against her.

7. On Friday, 3/5/76, Jerome Franks was placed under

arrest by Cpl. Robert McClements of the Dover Police Department, and charged with Sexual Misconduct.

8. On 3/5/76 at Family Court in Dover, Delaware, Jerome Franks did, after being arrested on the charge of Sexual Misconduct, ma[k]e a statement to Cpl. Robert McClements, that he thought the charge was concerning Cynthia Bailey not Brenda B. ———.

9. On Friday, 3/5/76, Cynthia C. Bailey, W/F/21 of 132 North Street, Dover, Delaware, did report to Dover Police Department that she had been raped at her residence during the night.

10. Investigation conducted by your affiant on Friday, 3/5/76, revealed the perpetrator of the crime to be an unknown black male, approximately 5'7", 150 lbs., dark complexion, wearing white thermal undershirt, black pants with a belt having a silver or gold buckle, a brown leather ¾ length coat with a tie belt in the front, and a dark knit cap pulled around the eyes.

11. Your affiant can state, that during the commission of this crime, Cynthia Bailey was forced at knife point and with the threat of death to engage in sexual intercourse with the perpetrator of the crime.

12. Your affiant can state that entry was gained to the residence of Cynthia Bailey through a window located on the east side of the residence.

13. Your affiant can state that the residence of Jerome Franks is within a very short distance and direct sight of the residence of Cynthia Bailey.

14. Your affiant can state that the description given by Cynthia Bailey of the unknown black male does coincide with the description of Jerome Franks.

15. On Tuesday, 3/9/76, your affiant contacted Mr. James Williams and Mr. Wesley Lucas of the Delaware Youth Center where Jerome Franks is employed and did have personal conversation with both these people.

16. On Tuesday, 3/9/76, Mr. James Williams revealed to your affiant that the normal dress of Jerome Franks does consist of a white knit thermal undershirt and a brown leather jacket.

17. On Tuesday, 3/9/76, Mr. Wesley Lucas revealed to your affiant that in addition to the thermal undershirt and jacket, Jerome Franks often wears a dark green knit hat.

18. Your affiant can state that a check of official records reveals that in 1971 Jerome Franks was arrested for the crime of rape and subsequently convicted with Assault with intent to Rape.

## APPENDIX B TO OPINION OF THE COURT

States permitting veracity challenges include:

Alabama: *McConnell* v. *State,* 48 Ala. App. 523, 526–528, 266 So. 2d 328, 330–333 (Crim. App.), cert. denied, 289 Ala. 746, 266 So. 2d 334 (1972).

Alaska: *Davenport* v. *State,* 515 P. 2d 377, 380 (1973).

Arizona: *State* v. *Payne,* 25 Ariz. App. 454, 456, 544 P. 2d 671, 673 (1976); cf. *State* v. *Pike,* 113 Ariz. 511, 513–514, 557 P. 2d 1068, 1070–1071 (1976) (en banc).

Colorado: *People* v. *Arnold,* 186 Colo. 372, 377–378, 527 P. 2d 806, 809 (1974) (en banc).

Iowa: *State* v. *Boyd,* 224 N. W. 2d 609, 616 (1974) (en banc).

Louisiana: *State* v. *Melson,* 284 So. 2d 873, 874–875 (1973), limiting *State* v. *Anselmo,* 260 La. 306, 313–322, 256 So. 2d 98, 101–104 (1971), cert. denied, 407 U. S. 911 (1972).

Massachusetts: *Commonwealth* v. *Reynolds,* 374 Mass. 142, 149–151, 370 N. E. 2d 1375, 1379–1380 (1977).

Minnesota:        *State* v. *Luciow,* 308 Minn. 6, 10–13, 240
                  N. W. 2d 833, 837–838 (1976) (en banc).
Montana:          *State* v. *Nanoff,* 160 Mont. 344, 348, 502
                  P. 2d 1138, 1140 (1972), *sub silentio* over-
                  ruling *State* v. *English,* 71 Mont. 343, 350,
                  229 P. 727, 729 (1924).
New Hampshire:    *State* v. *Spero,* 177 N. H. 199, 204–205, 371
                  A. 2d 1155, 1158 (1977) (based on State
                  Constitution).
Pennsylvania:     *Commonwealth* v. *Hall,* 451 Pa. 201, 204,
                  302 A. 2d 342, 344 (1973).
South Carolina:   *State* v. *Sachs,* 264 S. C. 541, 556, 216 S. E.
                  2d 501, 509 (1975).
Vermont:          *State* v. *Dupaw,* 134 Vt. 451, 452–453, 365
                  A. 2d 967, 968 (1976).
Washington:       *State* v. *Lehman,* 8 Wash. App. 408, 414,
                  506 P. 2d 1316, 1321 (1973) (Div. 3); *State*
                  v. *Goodlow,* 11 Wash. App. 533, 535, 523 P.
                  2d 1204, 1206 (1974) (Div. 1); cf. *State* v.
                  *Manly,* 85 Wash. 2d 120, 125, 530 P. 2d
                  306, 309 (en banc), cert. denied, 423 U. S.
                  855 (1975).

Five States, whose practice is dictated or may be dictated by statute, also permit veracity challenges:

California:       *Theodor* v. *Superior Court,* 8 Cal. 3d 77, 90,
                  100–101, 501 P. 2d 234, 243, 251 (1972)
                  (en banc); see Cal. Penal Code Ann.
                  §§ 1538.5, 1539, 1540 (West 1970 and Supp.
                  1978).
New York:         *People* v. *Alfinito,* 16 N. Y. 2d 181, 185–186,
                  211 N. E. 2d 644, 646 (1965); *People* v.
                  *Slaughter,* 37 N. Y. 2d 596, 600, 338 N. E.
                  2d 622, 624 (1975); see N. Y. Code Crim.
                  Proc. §§ 813–c, 813–d, 813–e (McKinney

Supp. 1970–1971), superseded by N. Y. Crim. Proc. Law, Art. 710 (McKinney Supp. 1977–1978).

North Carolina: See N. C. Gen. Stat. § 15A–978 (1978).

Oregon: *State* v. *Wright,* 266 Ore. 163, 168–169, n. 3, 511 P. 2d 1223, 1225–1226, n. 3 (1973) (en banc); see Ore. Rev. Stat. § 133.693 (1977).

Utah: *State* v. *Bankhead,* 30 Utah 2d 135, 138, 514 P. 2d 800, 802 (1973); see Utah Code Ann. §§ 77–54–17, 77–54–18 (1953).

Two other States are more doubtful, but seem to allow veracity challenges:

Michigan: *People* v. *Burt,* 236 Mich. 62, 74, 210 N. W. 97, 101 (1926).

New Mexico: *State* v. *Baca,* 84 N. M. 513, 515, 505 P. 2d 856, 858 (1973) (dictum).

The following States have disposed of particular veracity challenges on the ground the affidavits were in fact not false, or that any misstatements were immaterial or unintentional or were not by the affiant himself:

Florida: *McDougall* v. *State,* 316 So. 2d 624, 625 (Dist. Ct. App. 1975).

Georgia: *Williams* v. *State,* 232 Ga. 213, 213–214, 205 S. E. 2d 859, 860 (1974); *Lee* v. *State,* 239 Ga. 769, 773–774, 238 S. E. 2d 852, 856 (1977); *Birge* v. *State,* 143 Ga. App. 632, 633, 239 S. E. 2d 395, 397 (1977).

Indiana: *Moore* v. *State,* 159 Ind. App. 381, 385–386, 307 N. E. 2d 92, 94–95 (1974); *Grzesiow-ski* v. *State,* 168 Ind. App. 318, 328, 343 N. E. 2d 305, 312 (1976); but see *Seager* v. *State,* 200 Ind. 579, 582, 164 N. E. 274, 275 (1928).

| | |
|---|---|
| Ohio: | *State* v. *Dodson,* 43 Ohio App. 2d 31, 35–36, 332 N. E. 2d 371, 374–375 (1974). |
| Wisconsin: | *Scott* v. *State,* 73 Wis. 2d 504, 511–512, 243 N. W. 2d 215, 219 (1976). |
| Cf. Maine: | *State* v. *Koucoules,* 343 A. 2d 860, 865 n. 3 (1974). |

Eleven States flatly prohibit veracity challenges:

| | |
|---|---|
| Arkansas: | *Liberto* v. *State,* 248 Ark. 350, 356–357, 451 S. W. 2d 464, 468 (1970) (alternative holding); cf. *Powell* v. *State,* 260 Ark. 381, 383, 540 S. W. 2d 1, 2 (1976). |
| Connecticut: | *State* v. *Williams,* 169 Conn. 322, 327–329, 363 A. 2d 72, 76–77 (1975). |
| Illinois: | *People* v. *Bak,* 45 Ill. 2d 140, 144–146, 258 N. E. 2d 341, 343–344, cert. denied, 400 U. S. 882 (1970); *People* v. *Stansberry,* 47 Ill. 2d 541, 544, 268 N. E. 2d 431, 433, cert. denied, 404 U. S. 873 (1971). |
| Kansas: | *State* v. *Lamb,* 209 Kan. 453, 467–468, 497 P. 2d 275, 287 (1972); *State* v. *Sanders,* 222 Kan. 189, 194–196, 563 P. 2d 461, 466–467 (alternative holding), cert. denied, 434 U. S. 833 (1977). |
| Kentucky: | *Caslin* v. *Commonwealth,* 491 S. W. 2d 832, 834 (1973). |
| Maryland: | *Smith* v. *State,* 191 Md. 329, 334–336, 62 A. 2d 287, 289–290 (1948), cert. denied, 336 U. S. 925 (1949); *Tucker* v. *State,* 244 Md. 488, 499–500, 224 A. 2d 111, 117–118 (1966), cert. denied, 386 U. S. 1024 (1967); *Dawson* v. *State,* 11 Md. App. 694, 713–715, 276 A. 2d 680, 690–691 (1971). |
| Mississippi: | *Wood* v. *State,* 322 So. 2d 462, 465 (1975). |

| | |
|---|---|
| New Jersey: | *State* v. *Petillo,* 61 N. J. 165, 173–179, 293 A. 2d 649, 653–656 (1972), cert. denied, 410 U. S. 945 (1973); but see 61 N. J., at 178 n. 1, 293 A. 2d, at 656 n. 1. |
| Oklahoma: | *Brown* v. *State,* 565 P. 2d 697 (Crim. App. 1977), overruling *McCaskey* v. *State,* 534 P. 2d 1309, 1311–1312 (Crim. App. 1975), and *Henderson* v. *State,* 490 P. 2d 786, 789 (Crim. App. 1971), and reaffirming *Gaddis* v. *State,* 447 P. 2d 42 (Crim. App. 1968). |
| Tennessee: | *Owens* v. *State,* 217 Tenn. 544, 553, 399 S. W. 2d 507, 511 (1965); *Poole* v. *State,* 4 Tenn. Crim. 41, 53–54, 467 S. W. 2d 826, 832, cert. denied, *ibid.* (1971). |
| Texas: | *Phenix* v. *State,* 488 S. W. 2d 759, 765 (Crim. App. 1972); *Oubre* v. *State,* 542 S. W. 2d 875, 877 (Crim. App. 1976). |

Two States have prohibited challenges that were directed seemingly against the conclusory nature of the affidavits, rather than their veracity.

| | |
|---|---|
| Missouri: | *State* v. *Brugioni,* 320 Mo. 202, 206, 7 S. W. 2d 262, 263 (1928). |
| Rhode Island: | *State* v. *Seymour,* 46 R. I. 257, 260, 126 A. 755, 756 (1924), partially overruled, *State* v. *LeBlanc,* 100 R. I. 523, 528–529, 217 A. 2d 471, 474 (1966); but see *State* v. *Cofone,* 112 R. I. 760, 766–767, 315 A. 2d 752, 755–756 (1974). |

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, dissenting.

The Court's opinion in this case carefully identifies the factors which militate against the result which it reaches, and emphasizes their weight in attempting to limit the cir-

cumstances under which an affidavit supporting a search warrant may be impeached. I am not ultimately persuaded, however, that the Court is correct as a matter of constitutional law that the impeachment of such an affidavit must be permitted under the circumstances described by the Court, and I am thoroughly persuaded that the barriers which the Court believes that it is erecting against misuse of the impeachment process are frail indeed.

I

The Court's reliance on *Johnson* v. *United States,* 333 U. S. 10 (1948), for the proposition that a determination by a neutral magistrate is a prerequisite to the sufficiency of an application for a warrant is obviously correct. In that case the Court said:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.,* at 13–14.

The notion that there may be incorrect or even deliberately falsified information presented to a magistrate in the course of an effort to obtain a search warrant does not render the proceeding before a magistrate any different from any other factfinding procedure known to the law. The Court here says that "it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Ante,* at 165. I do not believe that this flat statement survives careful analysis.

If the function of the warrant requirement is to obtain the determination of a neutral magistrate as to whether sufficient

grounds have been urged to support the issuance of a warrant, that function is fulfilled at the time the magistrate concludes that the requirement has been met. Like any other determination of a magistrate, of a court, or of countless other fact-finding tribunals, the decision may be incorrect as a matter of law. Even if correct, some inaccurate or falsified information may have gone into the making of the determination. But unless we are to exalt as the *ne plus ultra* of our system of criminal justice the absolute correctness of every factual determination made along the tortuous route from the filing of the complaint or the issuance of an indictment to the final determination that a judgment of conviction was properly obtained, we shall lose perspective as to the purposes of the system as well as of the warrant requirement of the Fourth and Fourteenth Amendments. Much of what Mr. Justice Harlan said in his separate opinion in *Mackey* v. *United States*, 401 U. S. 667 (1971), with respect to collateral relief from a criminal conviction is likewise applicable to collateral impeachment of a search warrant:

> "At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

"A rule of law that fails to take account of these finality interests would do more than subvert the criminal process itself. It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, it is not easy to justify expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers litigating the validity under present law of criminal convictions that were perfectly free from error when made final. [Citation omitted.] This drain on society's resources is compounded by the fact that issuance of the habeas writ compels a State that wishes to continue enforcing its laws against the successful petitioner to relitigate facts buried in the remote past through presentation of witnesses whose memories of the relevant events often have dimmed. This very act of trying stale facts may well, ironically, produce a second trial no more reliable as a matter of getting at the truth than the first." *Id.,* at 690–691.

I am quite confident that if our system of justice were not administered by judges who were once lawyers, it might well be less satisfactory than it now is. But I am equally confident that one improvement which would manifest itself as a result of such a change would be a willingness, reflected in almost all callings in our society except lawyers, to refrain from constant relitigation, whether in the form of collateral attack, appeal, retrial, or whatever, of issues that have originally been decided by a competent authority.

It would be extraordinarily troubling in any system of criminal justice if a verdict or finding of guilt, later conclusively shown to be based on false testimony, were to result in the incarceration of the accused notwithstanding this fact. But the Court's reference to the "unthinkable imposition" of not allowing the impeachment of an affiant's testimony in support

of a search warrant is a horse of quite another color. Particularly in view of the many hurdles which the prosecution must surmount to ultimately obtain and retain a finding of guilt in the light of the many constitutional safeguards which surround a criminal accused, it is essential to understand the role of a search warrant in the process which may lead to the conviction of such an accused. The warrant issued on impeachable testimony has, by hypothesis, turned up incriminating and admissible evidence to be considered by the jury at the trial. The fact that it was obtained by reason of an impeachable warrant bears not at all on the innocence or guilt of the accused. The only conceivable harm done by such evidence is to the accused's rights under the Fourth and Fourteenth Amendments, which have nothing to do with his guilt or innocence of the crime with which he is charged.

Given the definitive exposition of the warrant requirement quoted above from *Johnson* v. *United States,* 333 U. S., at 13–14, it seems to me it would be quite reasonable for this Court, consistently with the Fourth and Fourteenth Amendments, to adopt any one of three positions with respect to the impeachability of a search warrant which had been in fact issued by a neutral magistrate who satisfied the requirements of *Shadwick* v. *Tampa,* 407 U. S. 345 (1972).

First, it could decide that the warrant requirement was satisfied when such a magistrate had been persuaded, and allow no further collateral attack on the warrant. In *Aguilar* v. *Texas,* 378 U. S. 108 (1964), the Court in reliance on *Giordenello* v. *United States,* 357 U. S. 480 (1958), a case concededly decided pursuant to Fed. Rule Crim. Proc. 4, nonetheless held that the determination by a magistrate that the affidavit submitted to him made out "probable cause" for purposes of the Fourth and Fourteenth Amendments was subject to later judicial review as to the sufficiency of the affidavit. This rule was later reaffirmed in *Spinelli* v. *United States,* 393 U. S. 410 (1969). The Court has thus for more than a decade

rejected the first possible stopping place in judicial re-examination of affidavits in support of warrants, and held that the legal determination as to probable cause was subject to collateral attack. While this conclusion does not seem to me to flow inexorably from the Fourth Amendment, I think that it makes a good deal of sense in light of the fact that a magistrate need not be a trained lawyer, see *Shadwick, supra,* and therefore may not be versed in the latest nuances of what is or what is not "probable cause" for purposes of the Fourth Amendment.

But to allow collateral examination of an affidavit in support of a warrant on a legal ground such as that is quite different from the rejection of the second possible stopping place as the Court does today. Magistrates need not be lawyers, but lawyers have no monopoly on determining whether or not an affiant who appears before them is or is not telling the truth. Indeed, a magistrate whose time may be principally spent in conducting preliminary hearings and trying petty offenses may have every bit as good a feel for the veracity of a particular witness as a judge of a court of general jurisdiction.

True, a warrant is issued *ex parte,* without an opportunity for the person whose effects are to be seized to impeach the testimony of the affiant. The proceeding leading to the issuance of a warrant is, therefore, obviously less reliable and less likely to be a searching inquiry into the truth of the affiant's statements than is a full-dress adversary proceeding. But it is at this point that I part company with the Court in its underlying assumption that somehow a full-dress adversary proceeding will virtually guarantee a truthful answer to the question of whether or not the affiant seeking the warrant falsified his testimony. A full-dress adversary proceeding is undoubtedly a better vehicle than an *ex parte* proceeding for arriving at the truth of any particular inquiry, but it is scarcely a guarantee of truth. Mr. Justice Jackson in his

opinion concurring in the result in *Brown* v. *Allen,* 344 U. S. 443 (1953), observed with respect to purely legal issues decided by this Court:

> "However, reversal by a higher court is not proof that justice is thereby better done. There is no doubt that if there were a super-Supreme Court, a substantial proportion of our reversals of state courts would also be reversed. We are not final because we are infallible, but we are infallible only because we are final." *Id.,* at 540.

The same is surely true of a judge's review of the factual determinations of a magistrate; a larger percentage of the judge's findings as to the truth of an affiant's statement may be objectively correct than the percentage of the magistrate's determinations which are, but neither one is going to be 100 percent. Since once the warrant is issued and the search is made, the privacy interest protected by the Fourth and Fourteenth Amendments is breached, a subsequent determination that it was wrongfully breached cannot possibly restore the privacy interest. See *United States* v. *Calandra,* 414 U. S. 338 (1974). Since the evidence obtained pursuant to the warrant is by hypothesis relevant and admissible on the issue of guilt, the only purpose served by suppression of such evidence is deterrence of falsified testimony on the part of affiant in the future. Without attempting to summarize the many cases in which this Court has discussed the balance to be struck in such situations, see *United States* v. *Peltier,* 422 U. S. 531 (1975), I simply do not think the game is worth the candle in this situation.

As the Court's opinion points out, the other jurisdictions which have considered this question are divided, although a majority of them favor the result reached by the Court today. The signed articles and student law review notes which the Court refers to in its opinion are not there, I trust, to be considered *en bloc* or by some process of counting without weighing. Presumably, to the extent that their reasoning

commends itself to the courts which are committed to decide these questions, that reasoning will find its way into the opinions of those courts; to the extent that the reasoning does not so commend itself, the piece containing the reasoning does not weigh in the scales of decision simply because it appeared in a periodical devoted to the discussion of legal questions.

## II

The Court has commendably, in my opinion, surrounded the right to impeach the affidavit relied upon to support the issuance of a warrant with numerous limitations. My fear, and I do not think it an unjustified one, is that these limitations will quickly be subverted in actual practice. The Court states:

> "Nor, if a sensible threshold showing is required and sensible substantive requirements for suppression are maintained, need there be any new large-scale commitment of judicial resources; many claims will wash out at an early stage, and the more substantial ones in any event would require judicial resources for vindication if the suggested alternative sanctions were truly to be effective. The requirement of a substantial preliminary showing should suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction." *Ante,* at 170.

I greatly fear that this generalized language will afford insufficient protection against the natural tendency of ingenious lawyers charged with representing their client's cause to ceaselessly undermine the limitations which the Court has placed on impeachment of the affidavit offered in support of a search warrant. I am sure that the Court is sincere in its expressed hope that the doctrine which it adopts will not lead to "any new large-scale commitment of judicial resources," but in the end I am led once more to echo the

observation contained in another opinion of Mr. Justice Jackson:

> "The case which irresistibly comes to mind as the most fitting precedent is that of Julia who, according to Byron's reports, 'whispering "I will ne'er consent,"—consented.'" *Everson* v. *Board of Education,* 330 U. S. 1, 19 (1947) (dissenting opinion).

Since I would not "consent" even to the extent that the Court does in its opinion, I dissent from that opinion and would affirm the judgment of the Supreme Court of Delaware.