UNITED STATES of America,
Appellee,

v.

Willie COREAS, Defendant–Appellant.

Docket No. 03–1790 CR.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 3, 2005.

Decided: Aug. 18, 2005.

Demetri Jones, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Emily Berger, Assistant United States Attorney, on the brief), Brooklyn, New York, for Appellee.

Harold Price Fahringer, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York, New York (Richard B. Schwartz, Schwartz & Grodofsky, Mineola, New York, and Erica T. Dubno, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, New York, New York, on the brief), for Defendant–Appellant.

Before: JACOBS and CALABRESI, Circuit Judges, and RAKOFF, District Judge.*

RAKOFF, District Judge.

Child pornography is so repulsive a crime that those entrusted to root it out may, in their zeal, be tempted to bend or even break the rules. If they do so, however, they endanger the freedom of all of us. Here, the Government obtained a warrant to search for child pornography in the private homes of 24 persons, including appellant Willie Coreas, on the basis of an FBI agent's affidavit that, as several courts have now determined, was in many material respects knowingly or recklessly false. *See, e.g., United States v. Strauser,* 247 F.Supp.2d 1135, 1142 (E.D.Mo.2003); *United States v. Perez,* 247 F.Supp.2d 459, 479–480 (S.D.N.Y.2003).

* The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

The false information was supplied by FBI Special Agent Geoffrey Binney, who, on his own initiative, began hunting for child pornography websites in late 2000. On January 2, 2001, Agent Binney encountered the "Candyman" site, an interactive "e-group" website that allowed its members to exchange information, upload and download electronic files, and chat with other members in "real time." The website invitation to join the Candyman e-group stated, in its entirety: "This group is for People who love kids. You can post any type of messages you like too or any type of pics and vids you like too. P.S. IF WE ALL WORK TOGETHER WE WILL HAVE THE BEST GROUP ON THE NET."

After becoming a member of Candyman by clicking the "join" button on its website, Agent Binney was presented with three options for receiving e-mail from the group: (1) he could receive each e-mail automatically; (2) he could receive a digest of each day's e-mails; or (3) he could receive no automatic e-mails whatever, leaving it to his personal discretion to visit the website and determine what individual messages he wished to read and what individual files he wished to download. Agent Binney chose to receive each e-mail automatically, and between January 2, 2001 and February 6, 2001, when Candyman was terminated, he received 498 e-mail messages from members of the group. About 100 of those e-mails had one or more picture files attached, with a total of 288 files transmitted. Of those 288 files, 105 contained child pornography, with the rest containing child "erotica" (such as children posed in provocative ways) that did not rise to the level of pornography.

On February 9, 2001, shortly after the site was shut down, Yahoo! Inc. ("Yahoo"), which hosted the site, provided the Government with a list of 3,397 e-mail addresses of people who were "members" between January 29 and January 31, 2001. During those three days, Agent Binney had received four Candyman e-mails containing child pornography. On August 31, 2001, Yahoo produced more complete activity logs for the group, including information about when members subscribed, unsubscribed, and carried out other activities such as posting images or text messages.

Binney then drafted an affidavit that law enforcement officials around the country relied on to support applications for search warrants to search the private residences of hundreds of people whose e-mail addresses were on these lists. One of those targeted was Coreas, whose e-mail address was shown to have subscribed to Candyman on January 17, 2001 and to have remained on the group's membership list for the three weeks until the group was shut down on February 6, 2001.

In his affidavit, Binney made numerous material assertions that two federal courts—after independently and contemporaneously conducting full evidentiary hearings—determined were knowingly or recklessly false. *See Strauser*, 247 F.Supp.2d at 1142; *Perez*, 247 F.Supp.2d at 479–80. These findings were subsequently adopted by other courts as well. *See United States v. Coye*, 2004 U.S. Dist. LEXIS 14979, at *3–*4 (E.D.N.Y.2004); *United States v. Kunen*, 323 F.Supp.2d 390, 393 (E.D.N.Y.2004); *United States v. Bailey*, 272 F.Supp.2d 822, 827–30 (D.Neb. 2003).

Among other things, Binney asserted in his affidavit that he had joined Candyman by sending an e-mail message to the group's moderator, a step he asserted was required of all new subscribers. However, as the two courts found, *see Perez*, 247 F.Supp.2d at 466; *Strauser*, 247 F.Supp.2d at 1139–40, and as the FBI itself subse-

quently determined, Binney, like others, actually joined the Candyman group simply by clicking a button on its website.[1] Binney also asserted in his affidavit that all Candyman members automatically received all messages and files sent to the group by other members, whereas, in fact—as Yahoo's data clearly showed, as the two courts later determined, *see Perez*, 247 F.Supp.2d at 467; *Strauser*, 247 F.Supp.2d at 1139, and as the prosecutor in the instant case eventually conceded—Candyman members who, like Binney, subscribed via the website were asked to elect among several options, one of which was not to receive any automatic e-mails or accompanying files whatever.

Expressly on the basis of the sworn assertions by Binney that were later determined to be knowingly or recklessly false, another FBI agent, Austin P. Berglas, submitted to Magistrate Judge Joan Azrack of the Eastern District of New York an affidavit dated November 9, 2001 in support of a warrant to search the homes of 24 persons, including Coreas, and to seize, *inter alia*, their personal computers and related equipment, their personal documents and records relating to same, their videotapes, cassettes, cameras and film, and even their address books. Among other things, the Berglas affidavit, expressly on the basis of Binney's false representations, averred that each Candyman member had received the same files that Agent Binney had received on any given day, and that Coreas, in particular,

had "received approximately 108 images of child pornography (one of which featured children in bondage), approximately 85 images of child erotica and 10 videos of child pornography." In actuality, the Government had no knowledge of what Coreas had received—even though, as subsequently determined, this was information it could readily have obtained from Yahoo if it had sought to do so. *See Perez*, 247 F.Supp.2d at 485. Instead, Berglas based these assertions in his affidavit entirely on Binney's false representations and inferences drawn therefrom.

Although the Berglas affidavit went on for many pages, no other allegations in the affidavit related specifically to Coreas, directly or indirectly. Instead, under the heading of "Child Pornography Collector Characteristics," the affidavit set forth the views of the FBI's "Behavioral Analysis Unit" as to the common "traits and characteristics" of people who collect child pornography, alleging, *inter alia*, that they "rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials" and that "[t]hey almost always maintain their collections in the privacy and security of their homes or other secure location." The warrant application made clear, however, that the purpose of such "collector" allegations was simply to show that, even if the evidence to search any member's home dated back to

---

1. Thus the FBI's Cyber Division concluded in a report dated December 12, 2002: "We were able to see from the source code, to our satisfaction, that the log entry showing SSA Geoffrey Binney's subscription to the 'thecandyman' egroup was generated as a direct result of the user (Mr. Binney) clicking on a button on the subscription web page that displays the email delivery options." Additionally, the information provided by Yahoo showed that the moderator of the Candyman website,

Mark Bates, had opted not to receive emails. Although the Government, on this appeal, appears not to acknowledge the FBI's own conclusions, *see Brief and Appendix for the United States* at 3–4 (admitting that affidavit was incorrect in asserting that each member received every e-mail but stating as fact that Binney and all other members were required to join via e-mail), the findings of the two district courts are, as discussed *infra*, binding on the Government.

February 2001 (when Binney completed his investigation) or earlier, by the time warrants were sought months later it still would be reasonable to expect to find evidence of a crime. The Government's papers submitted in support of the warrant nowhere argued that the "collector" allegations could support an inference that any individual member of Candyman had downloaded child pornography.

Based on the flawed Berglas affidavit, the requested warrant was issued, resulting, in Coreas' case, in the seizure of about one hundred computerized images involving child pornography found at his home.[2] This, in turn, led to his indictment on ten counts of possession of child pornography, *see* 18 U.S.C. § 2252A(a)(5)(B).

By the time Coreas was indicted, on March 13, 2002, the Government already possessed information that raised serious doubts about Binney's representations. In particular, on January 18, 2002, Yahoo sent the FBI a breakdown of the e-mail delivery options selected by Candyman subscribers. This data showed that, during the period investigated by Binney, *more than 85 percent of the Candyman members elected to receive no automatic e-mails whatsoever.* Therefore, not only had Binney been wrong to aver that every member automatically received each e-mail (with pornographic attachments in many cases), but in fact any given member was unlikely to have received any automatic e-mails from the group. Nonetheless, it was not until July 3, 2002 that the Government disclosed to Coreas' counsel that the Berglas affidavit was inaccurate in representing that every member of the Candyman group automatically received every e-mail message and file transmitted to the group. Even then, the Government's three-sen-

tence letter did not disclose the underlying data or the fact that the overwhelming majority of Candyman members had consciously elected not to automatically receive such files.

Still, the Government's modest disclosure led Coreas' counsel to move, on July 15, 2002, to suppress the fruits of the search warrant. In defending this motion, the Government relied on what proved to be more false statements from Binney. Specifically, in a July 1, 2002 affidavit prepared by Binney in an effort to minimize the effect of the revelation that most Candyman members had actually elected not to receive automatic e-mails, Binney reiterated his representation that he had joined Candyman via e-mail and had been given no e-mail delivery options at that time. Therefore, he stated, he had a good-faith belief when he completed his initial affidavit that all e-mails automatically went to each member.

Based on this averment, a number of courts considering Candyman suppression motions initially concluded that, while there might have been material misstatements in the Binney-based affidavits supporting various search warrants, the misstatements were inadvertent and therefore did not meet one of the requirements for suppression: that the misstatements be knowingly or recklessly false. In particular, on January 17, 2003, the district court here (Leonard D. Wexler, J.) denied Coreas' suppression motion from the bench on the ground that there was "no evidence whatsoever of intentional falsehood."

But in a Candyman case pending in the Eastern District of Missouri, the district court (Catherine D. Perry, J.), after initially reaching the same conclusion as the

2. The record of this appeal is silent as to what resulted from most of the other 23 searches, but public records of the Eastern District of New York indicate that many of the persons whose residences were searched were never charged with any crime.

district court here, was persuaded to re-open the matter and hear evidence. *See Strauser*, 247 F.Supp.2d at 1136. At that hearing, while Binney repeated his representation that he had joined Candyman by e-mail and had not been given the option not to receive automatic e-mails, a Yahoo representative testified that the company's electronic records showed definitively that Binney had subscribed via the website, at which point he was presented with the three e-mail delivery options. *Id.* at 1139–40. Furthermore, a report was introduced from the FBI's own Cyber Division reaching the same conclusions as the Yahoo representative. *Id.* Accordingly, the District Court, discrediting Binney, reached the following conclusion: "I now hold that the false information was recklessly included in the search warrant application, and that without the false information the warrant lacks probable cause, so I will grant Strauser's motion to suppress." *Id.* at 1136.

Almost simultaneously, in a Candyman case pending in the Southern District of New York, Judge Denny Chin conducted a lengthy evidentiary hearing on the same issues, and, in an opinion filed almost the same day as Judge Perry's decision in *Strauser*, independently reached the same conclusions. Among other things, Judge Chin concluded that the law enforcement agents had acted recklessly, in that they "had serious doubt as to the truth of the statements [in the Binney affidavit] or, at a minimum, they had obvious reasons to doubt [the statements'] veracity.'" *Perez*, 247 F.Supp.2d at 479. After excluding the false information from the affidavit, Judge Chin also concluded that there "was not a sufficient 'residue' to permit a magistrate judge to determine that a fair probability existed that contraband or evidence of child pornography would be found in [defendant's] home." *Id.* at 481.

In light of these developments, Coreas moved for reconsideration of Judge Wexler's denial of his suppression motion. However, in a written decision dated April 28, 2003, the district court denied this motion, on the ground that, even without the false statements, the Berglas affidavit was sufficient to support the warrant. *See United States v. Coreas*, 259 F.Supp.2d 218 (E.D.N.Y.2003). This, according to the district judge, was chiefly because "the affidavit contains extensive background information regarding subscribers to groups such as the Candyman group and the proclivity of members to use such groups to collect, trade and retain images of child pornography." *Id.* at 221.

On August 7, 2003, Coreas entered a guilty plea that, the Government agrees, *see Brief and Appendix for the United States* at 11 n. 7, permitted him to appeal the denial of his suppression motions. On December 10, 2003 he was sentenced to ten concurrent terms of 27 months' imprisonment. This appeal followed.

■ It is well established that a defendant seeking to suppress evidence that was gathered pursuant to a search warrant that was based on inaccurate representations by the Government must show (1) that the inaccuracies were the product of a Government agent's "deliberate falsehood" or "reckless disregard for the truth" rather than innocent mistake, and (2) that, after setting aside the falsehoods, what remains of the warrant affidavit is insufficient to support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir.2000).

■ Here, it is clear that Coreas has satisfied the first prong of the *Franks* standard. Two courts, after full evidentiary hearings, determined that the Binney-based allegations, to the effect that every

member of Candyman automatically received e-mailed files containing child pornography, were not only inaccurate but also made in reckless disregard of the truth. These factual findings, which the Government chose not to appeal, are therefore binding on the Government. *See Benjamin v. Coughlin,* 905 F.2d 571, 576 (2d Cir.1990).[3]

Once these allegations are excised, what is left to support the search in this case? Simply the allegation that Coreas logged onto the Candyman website and, by clicking a button, responded affirmatively to a three-sentence invitation (quoted *supra*) to join its e-group. The alleged "proclivities" of collectors of child pornography, on which the district court relied, are only relevant if there is probable cause to believe that Coreas is such a collector. But the only evidence of such in the excised affidavit is his mere act of responding affirmatively to the invitation to join Candyman.

In the view of this panel, that does not remotely satisfy Fourth Amendment standards. We had thought it was well settled that a "person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). All that Coreas did, so far as the excised affidavit shows, was to respond to a three-sentence suggestive invitation from Candyman to join its e-group by clicking a button that added his e-mail address to its roll of members but in no way committed him to partaking in any of its various activities, lawful or unlawful, or even to receiving its e-mails (which he had the option to refuse from the outset). The notion that, by this act of clicking a button, he provided probable cause for the police to enter his private dwelling and rummage through various of his personal effects seems utterly repellent to core purposes of the Fourth Amendment. *See generally Wilson v. Layne,* 526 U.S. 603, 610, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home."); *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (internal quotations omitted); *Lauro v. Charles,* 219 F.3d 202, 211 (2d Cir.2000) (describing "particular gravity the Fourth Amendment accords to government intrusions" on privacy of the home). When there is added to this the fact that the actual allegations on which the magistrate judge almost certainly relied in granting the warrant were the very ones later shown to be knowingly or recklessly false, the entire exercise of trying to stretch the remaining unparticularized allegations to uphold the search seems counterproductive. *See Franks,* 438 U.S. at 166, 98 S.Ct. 2674 (the purpose of the exclusionary rule is to "deter official misconduct").

To find otherwise, moreover, is to chill the rights of speech and association guaranteed by the First Amendment. That Candyman was a forum for a repugnant viewpoint does not alone support an inference of criminal conduct. Coreas broke no laws in joining the group and visiting its website, provided that he did not download any child pornography while there (and there was no allegation that he did). Many of the activities Candyman facilitated, such as members' chatting with each

---

**3.** By contrast, the Government can relitigate the *legal* conclusions of *Strauser* and *Perez* pertaining to probable cause requirements. *See United States v. Mendoza,* 464 U.S. 154, 163, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984).

other, are protected by the First Amendment. Where an organization is not so "wholly illegitimate" that membership itself necessarily implies criminal conduct, membership alone cannot provide probable cause. *See United States v. Brown*, 951 F.2d 999, 1003 (9th Cir.1991).

Nonetheless, in a case argued a few weeks before this one and decided earlier this month, a divided panel of this Court appeared to reach different conclusions from those set forth above. *See United States v. Martin*, No. 04–1600, 2005 U.S.App. LEXIS 16143 (2d Cir. Aug. 4, 2005). *Martin* found the requirements of probable cause met by a similar affidavit pertaining to a defendant's membership in a related e-group, girls12–16. *Id.*, slip op. at 16–17. The excised portions of the affidavit were not necessary to establish probable cause, *Martin* concluded, because a defendant's mere membership in an e-group whose "primary reason for existence" is to trade child pornography is enough. *Id.*

Arguably *Martin* might be distinguished from the instant case on the ground that the defendant there had joined a different group, girls12–16. Even a first-time visitor, according to the *Martin* majority, would have instantly recognized the unlawful nature of girls12–16, since its "welcome message," longer and more detailed than Candyman's, "unabashedly announced that its essential purpose was to trade child pornography." *Martin*, slip op. at 14. But the *Martin* majority did not itself regard such distinctions as decisive, as shown by its comment elsewhere that "the affidavit alleged that the way the [two] websites operated was not materially different. The text of girls12–16's welcome message, however, was even more explicit about its illicit purpose." *Id.*, slip op. at 9–10 n. 4. This indicates that the *Martin* majority regarded the differences between

the websites as immaterial and regarded the Candyman welcome message as explicit enough to warrant an inference of unlawful purpose.

It appears to us, however, that the *Martin* majority's analysis of the welcome messages of both websites may have given insufficient recognition to their invitation to members to simply exchange views: in the vernacular, to serve as "chat rooms." The shorter, Candyman message invites prospective members to "post any type of messages you like," while the longer, girls12–16 message invites prospective members to "share experiences with others, share your views and opinions quite freely without censorship." Although *Martin* treats these invitations to exercise free speech as merely a facade, *see Martin*, slip op. at 15; *see also id.* at 19 n. 6, the evidence is to the contrary. Thus, in the case of Candyman, the Yahoo data (which the Government could just as easily have obtained before seeking the search warrant as it did thereafter) showed not only that someone joining Candyman through the website knew he had the option to exclude all automatic emails (and thus any automatically-generated pornographic files attached thereto) but also that 85 percent of the members chose this option. While no comparable figures for the girls12–16 website are given in the *Martin* opinion, the point is that people who joined both websites were invited to do so even if their only purpose was to chat about a taboo subject, and that, explicitly in the case of Candyman and without any evidence to the contrary in the case of girls12–16, they were provided with the tools to so limit their exchanges. By contrast, there is no evidence whatever, in the Berglas affidavit or otherwise, suggesting that any, let alone all, of the 24 persons whose homes the Government sought to search regarded this invitation to chat as simply a charade. Rather, *Martin* faults

the defendant there for failing to submit evidence that either site was used for legal purposes. *Martin*, slip op. at 19. But it is the Government's burden to provide probable cause to believe that a defendant was undertaking some unlawful activity before a search warrant may issue.

Nor is any recognition given in *Martin* to the fact that becoming a "member" of either of these e-groups is not remotely comparable to, say, becoming a member of organized crime, which requires a lengthy apprenticeship and elaborate initiation, *see e.g., United States v. Scarfo,* 711 F.Supp. 1315, 1339 (E.D.Pa.1989) (describing initiation requirements, which for this defendant included killing a judge as well as participating in a "making ceremony," and concluding that, given the group's formal structure, attaining such membership implied agreement in all of the group's illegal purposes). According to the *Martin* majority, someone who, on visiting the Candyman or girls12–16 website, simply clicks the joinder button—out of curiosity or even from sheer inadvertence—thereby provides probable cause, *without more,* for the search of his home.

Even if the sole purpose of Candyman had been to distribute pornography, the claim that mere membership in an organization with an illegal purpose establishes probable cause is in conflict with the dictate of *Ybarra* that probable cause be backed, at least in part, by evidence particularized to the target of the search. But the *Martin* majority opinion might be read to suggest that if you simply web-join an e-group whose "primary" purpose is the unlawful distribution of pornography, that is enough to warrant the search of your home—even if there is no evidence that you knew this was the group's "primary" purpose or that you actually intended to use the group for such a purpose rather than for the other, lawful purposes that it also provided. Such a rule, by focusing on the ordering of the purposes of the group, rather than the activities of the person whose home is to be searched, might tend to dilute the First Amendment's protection against guilt by association and diminish the Fourth Amendment's focus on particularity and on protection of the privacy of the individual to be searched.

*Martin* seeks to "balance" such considerations against "the need for law enforcement to have a certain amount of latitude in conducting criminal investigations." *See Martin,* slip op. at 17–18. However, *Martin* does not explain why such additional latitude was needed in these cases. Having already obtained some basic information from Yahoo even before Binney completed his investigation, the Government could easily have obtained more particularized information about each defendant. Once it identified a website as containing illegal pictures, it could have monitored the traffic to that website and ascertained which members actually downloaded pornography. *See United States v. Gourde,* 382 F.3d 1003, 1012 (9th Cir.2004). It could have obtained each member's e-mail preferences and then targeted its warrant applications to those members actually receiving the e-mails in question. There clearly was no exigency preventing the Government from taking such steps, given that the warrant application was not made until seven months after Candyman was shut down. Far from hindering the Government's ability to prevent the distribution of child pornography over the Internet, requiring particularized information to be gathered before the warrant application is made will simply focus law enforcement efforts on those who can reasonably be suspected of receiving child pornography.

For these reasons, as well as for the many other reasons so well articulated by Judge Pooler in her dissent in *Martin*, we believe *Martin* itself was wrongly decided. Nonetheless, since the *Martin* case was heard first, we are compelled, under established rules of this circuit, to affirm Coreas' conviction.

As for Coreas' sentence, the parties are agreed that, because appellant was sentenced under the mandatory Sentencing Guidelines regime and *United States v. Booker*, — U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), was decided while this case was pending on direct review, the case must be remanded for possible resentencing. *See United States v. Crosby*, 397 F.3d 103, 117 (2d Cir.2005).

Accordingly, Coreas' conviction is Affirmed but the case is Remanded for further sentencing proceedings consistent with *Booker* and *Crosby*.