

Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-16-2006

# USA v. Shields

Precedential or Non-Precedential: Precedential

Docket No. 05-3662

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Shields" (2006). *2006 Decisions.* Paper 519.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/519

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-3662

———

UNITED STATES OF AMERICA

v.

ERIC SHIELDS,

<u>Appellant</u>

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 01-cr-00384)
Honorable Malcolm Muir, District Judge

———

Argued June 30, 2006

BEFORE: AMBRO, FUENTES, and GREENBERG,
<u>Circuit</u> <u>Judges</u>,

(Filed: August 16, 2006)

———

Thomas A. Marino
United States Attorney
Martin C. Carlson
Assistant United States Attorney
Theodore B. Smith, III (argued)
Assistant United States Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108

<u>Attorneys for Appellee</u>

James V. Wade
Federal Public Defender
Middle District of Pennsylvania
Ronald A. Krauss (argued)
Assistant Federal Public Defender-Appeals
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

    Attorneys for Appellant

——————

OPINION OF THE COURT

——————

GREENBERG, Circuit Judge.

## I.  INTRODUCTION

This matter comes on before the court on appeal from a judgment of conviction and sentence entered in the district court on July 28, 2005, and from an order entered in the district court on April 14, 2004, denying defendant Eric Shields' motion to suppress evidence the FBI obtained from a search of his home pursuant to a search warrant and to suppress statements that he made at his home following the search.  Shields asserts that the warrant was based on an affidavit containing intentionally or recklessly false statements and that, purged of these statements, the affidavit does not supply probable cause for the warrant.  The district court denied Shields' request for a hearing on his motion pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674 (1978), as it concluded that the affidavit supports a finding of probable cause even with the purportedly false statements excised.  For the following reasons, we will affirm the judgment and order of the district court.

## II.  FACTUAL AND PROCEDURAL HISTORY

On January 2, 2001, FBI Special Agent Geoffrey Binney, working in an undercover capacity, subscribed online to an

entity called the "Candyman" e-group.[1]  The Candyman e-group was a free website to which one could subscribe by providing an e-mail address.   The purpose of the Candyman e-group, as stated on its own website, was as follows:

> This group is for People who love kids.  You can post any type of messages you like too [sic] or any type of pics and vids you like too [sic].  P.S. IF WE ALL WORK TOGETHER WE WILL HAVE THE BEST GROUP ON THE NET.

App. at 79, ¶ 10.  As this pronouncement suggests, members of the Candyman e-group could discuss their shared interests, as well as exchange images and video files.  The website also provided:  a "polls" feature, which allowed members to participate in surveys; a "links" section, which allowed members to share website addresses for websites containing similar content; and a "chat" section, which allowed members to engage in realtime conversations with other members online.  In particular, Agent Binney was interested in investigating the use of the Candyman e-group to transmit child pornography in violation of 18 U.S.C. § 2252A.[2]  As a member of the Candyman e-group, Agent Binney received e-mails containing hundreds of images and video clips depicting children engaged in sexual activities.

Through his membership in the Candyman e-group,

---

[1]In general, individuals form e-groups on the Internet to allow those with similar interests to associate with one another via the world wide web, often exchanging information regarding their mutual interests.

[2]18 U.S.C. § 2252A prohibits, <u>inter alia</u>, the knowing transportation, possession, receipt, distribution, or reproduction of visual depictions of children engaged in sexually explicit conduct mailed, shipped or transported in interstate or foreign commerce.  18 U.S.C. §§ 2252A(a)(1)-(6), 2256(8).  The statute defines "child pornography" as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture" of, <u>inter alia</u>, "a minor engaging in sexually explicit conduct."  18 U.S.C. § 2256(8).

3

Agent Binney learned of another e-group called "Girls12-16," the purpose of which it stated on its website as follows:

Hi all, This group is for all those ho [sic] appreciate the young female in here [sic] finest form. Watching her develop and grow is like poetry in motioon [sic], to an age where she takes an interest in the joys and pleasures of sex. There is probably nothing more stimulating than watching a young teen girl discover the pleasures of the orgasm. The joy of feeling like she is actually coming into womanhood. Its [sic] an age where they have no preconditions about anything, just pure opennes [sic]. What a joy to be part of that wonderful experience and to watch the development of this perfect form. This is the place to be if you love 11 to 16 yr olds. You can share experiences with others,. [sic] share your views and opinions quite freely without censorship.. [sic] YOu [sic] can share all kinds of other information as well regarding - your current model: if you are a photographer. Where the best place to meet gitls [sic] is. The difficulties you experience in your quest. The best ways to chat up. Good places to pick up girls. Girls you would like to share with others. The choice is all yours. Welcome home! Post videos and photographs . . . and how about your true life experiences with them so other viewers can paint a mental picture andin [sic] some ways share the experience with you. You could connect with others from the same country as you and get together sociall [sic] if you wish. The choice is all yours. How about a model resource for photographers? It's all up to you and is only limited by your own imaginations. Membership is open to anyone but you will need to post something first. Mybe [sic] a little bit about yourself/what your interests are (specifically), what your age looking for (specifically), your age, location . . . and a pic or vid would be a good to [sic]. By doing this, other members (or potential

members) with the same interest may then contact you if you wish them to.

App. at 82-83, ¶ 15. As with the Candyman e-group, Agent Binney was interested in investigating the use of the Girls12-16 e-group to transmit child pornography in violation of 18 U.S.C. § 2252A. To this end, Agent Binney joined the Girls12-16 e-group from February 2, 2001, through February 15, 2001, and during this time he received numerous e-mails containing images of child pornography.

In the course of his investigation, Agent Binney served a federal grand jury subpoena on Yahoo Services (Yahoo), said to be the owner and operator of the e-groups, directing Yahoo to divulge information regarding the members of the e-groups under investigation. On February 6, 2001, Yahoo shut down the Candyman e-group and provided the FBI with a list of approximately 3,397 members' e-mail addresses. With this information, the FBI issued subpoenas to the e-mail providers requesting identifying information, including the members' names, addresses, and phone numbers. The FBI then transmitted this information to local FBI offices, which were assigned to investigate individual members as part of a national investigation dubbed "Operation Candyman."

To assist the local offices with their investigations, Agent Binney provided a template for a search warrant affidavit containing general information obtained during the course of his investigation. Of particular importance, Agent Binney explained how he purportedly joined the e-groups and the workings of them, including in pertinent part:

11. As a result of SA Binney's investigation, the FBI determined the following about the Candyman Egroup:

(a) Voluntary Egroup Membership: In order to join the Egroup, a person had to visit the URL and send an email to the group moderator requesting permission to join. The moderator would then send a confirmation notice to the requestor's email account, advising him that he now had access to

5

the Egroup. . . .

(b)  Website Features: The Candyman Egroup's website had several different features.  First, the 'Files' section provided an area for members to post images or video files for others to download .  . . .  Second, all new members of the Egroup were immediately added to the Candyman e-mail list.  Every e-mail sent to the group was distributed to every member automatically.  Therefore, when an individual uploaded and transmitted child pornography to the Candyman group, those images were transmitted to every one of the group members . . . .

(c)  Images Posted on the Web-site: The primary feature of the Candyman Egroup's website was the 'Files' section.  This allowed members to upload and download images directly to the website. . . . [W]hen someone uploaded a file to the website, the moderator sent a notice via e-mail to all members advising them of the nature of the file, the date and time the file was posted, which folder it had been posted in, and the e-mail address of the person who posted it.

. . .

12.  [The other] Egroups were set up in very much the same format as the Candyman [Egroup]. Each [including the Girls12-16 Egroup] contained the same e-mail group list feature so that each member received any child pornography or erotica that was transmitted to the group.

App. at 80-81, ¶¶ 11-12 (emphases added).  These statements were significant because they represented to any judge from whom the FBI sought a search warrant that all members of the Candyman and Girls12-16 e-groups automatically received all e-mails and that therefore all members must have received e-mails that contained child pornography.

6

Special Agent Keith Cutri of the FBI's Philadelphia Division used Agent Binney's template to investigate certain members, including Shields, who signed up for the Candyman and Girls12-16 e-groups using the e-mail address "LittleLolitaLove@aol.com."  In addition to the representations contained in Agent Binney's template, the search warrant affidavit Agent Cutri submitted contained certain particularized representations with regard to Shields.  The affidavit explained that information obtained from AOL revealed that the "LittleLolitaLove" e-mail address was registered to Shields.  Also, the affidavit explained that the "LittleLolitaLove" e-mail address appeared on both the Candyman and Girls12-16 e-group member lists obtained from Yahoo, and the affidavit further specified the membership registration dates.  As a member of the two e-groups in question, Shields had access to downloadable images of child pornography for a period exceeding one month until Yahoo shut down the groups.  Finally, the affidavit stated the following with regard to Shields:

> 25.  From 01/02/2001 through 02/06/2001, LittleLolitaLove@aol.com received e-mail containing images of nude children engaged in sexual activity and/or posing in provocative positions.

App. at 86, ¶ 25.  Paragraph 25 of the affidavit included examples by file name and description.  See, e.g., app. at 86, ¶ 25 ("Little boy simulating intercourse with little girl, both nude.").  This representation apparently derived from the general representation made in Agent Binney's template affidavit that "Every e-mail sent to the group was distributed to every member automatically."  App. at 80, ¶ 11(b).

The search warrant affidavit Agent Cutri submitted also included statements regarding the "Methods and Habits of Child Pornographers," which described certain "usual" or "typical" behaviors of such persons, see app. at 88-92, ¶ 29, and explained the specialized meaning of the term "Lolitas" in the vernacular of child pornographers.  App. at 88, ¶ 29(a).  Agent Cutri's affidavit concluded with a statement concerning the highly technical expertise needed to search computer systems, which

7

necessitated the need to seize Shields' computer equipment.

Agent Cutri submitted the search warrant affidavit to a magistrate judge, who in turn determined that there was probable cause to search Shields' home. On November 29, 2001, FBI agents executed the search warrant at Shields' residence and seized computer equipment belonging to Shields. At the time of the search, agents had an opportunity to speak with Shields, who waived his Miranda[3] rights and agreed to an interview. Significantly, Shields provided a handwritten statement acknowledging that he had viewed, obtained, received and possessed child pornography from the Internet with his computer. Shields' statement was consistent with the results of a subsequent search of his computer which contained hundreds of images of child pornography, including images that reflected cruel sexual abuse and mistreatment of minors, and numerous saved e-mails evidencing his receipt of the child pornography. FBI agents also discovered a cache of binders and notebooks containing child pornography.

On December 5, 2001, a federal grand jury returned a single count indictment against Shields charging him with possession of computer disks and other material containing images of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2).[4] Shields entered a plea of guilty on February 27, 2002.

Following Shields' guilty plea, the prosecution notified

---

[3]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

[4]18 U.S.C. § 2252A(a)(5)(B) makes it unlawful to "knowingly possess[] any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer," which offenses are punishable as provided in 18 U.S.C. § 2252A(b).

defense counsel of certain erroneous factual assertions made in the search warrant affidavit. Most notably, in a letter dated July 9, 2002, the prosecution advised defense counsel that the statement in the affidavit that "[e]very e-mail sent to the group was distributed to every member automatically" was "apparently not accurate." App. at 98. In fact, the prosecution explained, members could select from three delivery options: receiving all e-mails, receiving only a daily digest of e-mails, or receiving no e-mails at all. Thus, the government's representation that mere membership in the e-groups equated with receipt of child pornography by "every member automatically" was false. Indeed, an individual could have been a member of the e-groups without receiving any e-mails transmitting images of child pornography. As an analytical matter, this revelation also undermined both the statement in paragraph 25 that "[LittleLolitaLove@aol.com](mailto:LittleLolitaLove@aol.com) received e-mail containing images of nude children engaged in sexual activity and/or posing in provocative positions," and the list of specific examples of files received. Without specifying which e-mail delivery option Shields chose, the government would not have been able to make this particularized representation in the affidavit.

By letter to defense counsel dated October 9, 2002, the prosecution wrote "to provide [counsel] further information" regarding the inaccuracies in the affidavit. App. at 116. The prosecution explained that during a hearing in another district court pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, certain evidence "provide[d] a basis for challenging Agent Binney's testimony" regarding his registration with the Candyman e-group, on which he purportedly based statements in the affidavit. App. at 117. In particular, Yahoo produced evidence demonstrating that a person could register in either of two ways as an e-group member: (1) via the e-group's website, in which case "[Agent Binney] would have automatically been presented with e-mail delivery options;" and (2) via e-mail to the e-group moderator, in which case the delivery options would not have been presented automatically. App. at 117. The prosecution explained that, although Agent Binney testified that he subscribed via e-mail and thus was not presented with the e-mail delivery options, Yahoo produced contradictory evidence demonstrating that Agent Binney, in fact, registered via the e-

9

group's website, thus providing him with the e-mail delivery options. In closing its letter, however, the prosecution cautioned that it believed there was "reason to question" the accuracy of Yahoo records "based on past experience." App. at 117.

Any reason to question Yahoo's records vanished, however, after an internal FBI investigation verified the accuracy of Yahoo's records and thus confirmed that Agent Binney's testimony was false. By letter to defense counsel dated January 3, 2003, the prosecution revealed the specifics of the FBI investigation and explained its ramifications:

> [O]n December 5, 2002, representatives of the FBI Cyber Operation Deployment Unit's Special Technologies Applications Section traveled to Yahoo! headquarters to review the source code for the eGroups.com website. As a result of this review, the FBI concluded that Special Agent Binney's subscription to 'thecandyman' e-group was generated as a direct result of Special Agent Binney clicking on a button on a subscription web page that displayed e-mail delivery options. As a result, Special Agent Binney would have been confronted by e-mail delivery options.

App. at 121. In sum, contrary to Agent Binney's statements in his template affidavit, he had various e-mail delivery options when he joined the Candyman e-group, one of which would have resulted in him not receiving any e-mails. Thus, contrary to his subsequent testimony at the district court hearing in another case, he did have the delivery options when he registered.

In light of the emerging factual inaccuracies in the search warrant affidavit, Shields moved to revise his guilty plea to a conditional plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), which preserved his right to appeal from the denial of a motion to suppress and the district court granted his request. On February 13, 2004, Shields filed a motion to suppress the evidence obtained pursuant to the search warrant as well as the statements he made after the search. Shields claimed that

10

because of the false statements in the affidavit, the court should suppress the evidence the FBI obtained from his home, and he further claimed that the court should suppress his subsequent statements to the FBI as fruit of the illegal search. Shields requested a hearing pursuant to Franks v. Delaware in order to test the veracity of the search warrant affidavit.

In an order entered April 14, 2004, the district court denied his request for a Franks hearing and denied his motion to suppress. The court assumed for purposes of its decision that the affidavit contained intentionally or recklessly false statements but held that even purged of the offending material the affidavit supported a finding of probable cause. App. at 13-15. Specifically, the court concluded:

> The affidavit, even after being purged of inaccurate statements, contains several asserted facts that combine to support a finding of probable cause. Those facts show (1) that the purpose of the 'Candyman' and 'Girls12-16' websites clearly was to share child pornography, (2) that Shields voluntarily became a member of the websites, and (3) that images containing child pornography were available to all members. The affidavit contains extensive background information regarding subscribers to such websites and the proclivity of members to use such websites to collect, trade and retain images of child pornography. It is also clear that Shields subscribed or joined the websites.

> The affidavit in this case directly tied Shields to two child pornography websites and documented the distribution of more than 100 images of child pornography from those sites while Shields participated in the websites. The affidavit then tied Shields's residence to this activity through the email address used by Shields, 'LittleLolitaLove@aol.com' an email address which was itself strongly suggestive of pornographic activity, and was directly connected through billing records to Shields's home. Read in

11

a commonsense fashion, these facts clearly link
Shields's home to criminal activity.

App. at 15 (footnote omitted).

The court ultimately entered a judgment of conviction against Shields on July 28, 2005, which included, inter alia, an 18-month custodial term. Shields timely filed this appeal on July 29, 2005.

## III. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. In reviewing the district court's denial of a motion to suppress, we review its factual findings for clear error and exercise plenary review over its legal determinations. See United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). Where, as here, "a district court, in reviewing a magistrate's determination of probable cause, bases its probable cause ruling on facts contained in an affidavit, we exercise plenary review over the district court's decision." Id. (citing United States v. Conley, 4 F.3d 1200, 1204 (3d Cir. 1993)); see also United States v. Martin, 426 F.3d 68, 74 (2d Cir. 2005) ("Whether the untainted portions [of the affidavit] suffice to support a probable cause finding is a legal question, and we review the district court's ruling on that question de novo.") (internal quotation marks and citation omitted).

## IV. DISCUSSION

We note at the outset of our discussion that while this case seems to be the only one that has come before this court arising from "Operation Candyman," numerous other courts have addressed similar challenges. With over three thousand members linked to the e-groups in question, Agent Binney's misrepresentations have spawned a veritable cottage industry of

<u>Franks</u> challenges by Candyman defendants across the country.[5] <u>See, e.g.</u>, <u>Martin</u>, 426 F.3d 68; <u>United States v. Ramsburg</u>, 114 Fed. Appx. 78 (4th Cir. 2004); <u>United States v. Froman</u>, 355 F.3d 882 (5th Cir. 2004); <u>United States v. Hutto</u>, 84 Fed. Appx. 6 (10th Cir. 2003); <u>United States v. Kunen</u>, 323 F. Supp. 2d 390 (E.D.N.Y. 2004); <u>United States v. Bailey</u>, 272 F. Supp. 2d 822 (D. Neb. 2003); <u>United States v. Strauser</u>, 247 F. Supp. 2d 1135 (E.D. Mo. 2003); <u>United States v. Perez</u>, 247 F. Supp. 2d 459 (S.D.N.Y. 2003).

The rule governing allegedly misleading search warrant affidavits is well established.  <u>See</u> <u>United States v. Frost</u>, 999 F.2d 737, 742 (3d Cir. 1993) (following <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S. Ct. 2674).  Where a defendant demonstrates by a preponderance of the evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause," the Fourth Amendment requires that "the fruits of the search" be excluded "to the same extent as if probable cause was lacking on the face of the affidavit."  <u>Franks</u>, 438 U.S. at 155-56, 98 S. Ct. at 2676.  Accordingly, in order to void the warrant and suppress the evidence, the defendant "must show both [1] that bad faith or reckless disregard existed on the part of the affiant, and [2] that there would have been no probable cause but for the incorrect statement."  <u>Frost</u>, 999 F.2d at 743; <u>see also</u> <u>United States v. Harvey</u>, 2 F.3d 1318, 1323 (3d Cir. 1993).

### 1. <u>Intentional or Reckless Falsehood</u>

In denying Shields' request for a <u>Franks</u> hearing, the district court did not make any findings with regard to the first element of the two-part <u>Franks</u> test and instead assumed for purposes of its decision that the affidavit contained intentionally or recklessly made false statements.  In this regard we point out that it is beyond question that the police cannot insulate a deliberate falsehood from a <u>Franks</u> inquiry simply by laundering

---

[5]Agent Binney no longer is with the FBI.  <u>See</u> <u>United States v. Perez</u>, 247 F. Supp. 2d 459, 463 (S.D.N.Y. 2003).

the falsehood through an unwitting affiant who is ignorant of the falsehood. Franks, 438 U.S. at 164 n.6, 98 S.Ct. at 2680 n.6; United States v. Calisto, 838 F.2d 711, 714 (3d Cir. 1988) (holding that conduct of officers who relayed facts to the affiant was relevant to Franks inquiry). To this end, Shields cites two cases in which district courts conducted evidentiary hearings on the affidavit of Agent Binney that Agent Cutri utilized in this case as a portion of Cutri's affidavit, and determined that it contained false statements made with reckless disregard for the truth. Appellant's br. at 16-17; 19-20 (citing Perez, 247 F. Supp. 2d at 479; Strauser, 247 F. Supp. 2d at 1143). Shields asserts that these factual findings "are binding on the Government as a matter of offensive collateral estoppel." Appellant's br. at 16; see also United States v. Coreas, 419 F.3d 151, 156 (2d Cir. 2005) ("These factual findings [from Perez and Strauser], which the Government chose not to appeal, are therefore binding on the Government."). We, however, need not address the application of nonmutual offensive collateral estoppel inasmuch as we agree with the district court that Cutri's affidavit even purged of the offending material supports a finding of probable cause.

## 2. Probable Cause

In Illinois v. Gates, the Supreme Court enunciated the principles that animate a probable cause determination:

> The task of the issuing magistrate is simply to make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . concluding' that probable cause existed.

462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332 (1983) (internal quotation marks and citation omitted). "Probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232; 103 S.Ct. at 2329. The Fourth

14

Amendment, however, "generally bars officials from undertaking a search or seizure absent individualized suspicion." Chandler v. Miller, 520 U.S. 305, 308, 117 S.Ct. 1295, 1298 (1997). It is well established that a search "must be supported by probable cause particularized with respect to that person," and that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 342 (1979).

Shields asserts that the excised affidavit does not include sufficient particularized information to support a finding that there was probable cause for issuance of the warrant in his case and that his mere propinquity to other e-group members is an insufficient basis on which to establish probable cause per Ybarra. In addition, Shields asserts that the district court erred in concluding that the websites fairly can be characterized as having wholly illegal purposes and that, in any event, nothing in the affidavit links the generic profile of child pornography collectors to him. The prosecution counters by arguing that Shields premises his challenge on "one narrow aspect of the affidavit," Appellee's br. at 13, namely, the assertion that every member, including Shields, automatically received every e-mail containing images of child pornography.

To be sure, the prosecution understates the import of this so-called "narrow aspect." Although the prosecution states that "the error was not recognized," thus resulting in submission of the affidavit "without further clarification on this point," id., it is hard to conceive what "clarification" it believes could remedy the unquestionably false representation and which several courts, after full evidentiary hearings, concluded was made with reckless disregard for its truth. See Perez, 247 F. Supp. 2d at 479-80; Strauser, 247 F. Supp. 2d at 1142-43. Considering that the investigation targeted potentially thousands of e-group members, inclusion of the false statements in the "template" affidavit was a blunder of great proportion. What is more, the representation that every e-group member received every e-mail that contained images of child pornography was perhaps the strongest and most direct link between Shields and the suspected illegal activity, and its inclusion is troubling. Indeed, the

15

government deduced from this misrepresentation that Shields, as a member, received images of child pornography via e-mail. In the circumstances, we are satisfied that these misrepresentations were important in establishing probable cause.

Yet, despite their importance, these misrepresentations were not necessary to a finding of probable cause inasmuch as without them other, unchallenged portions of Cutri's affidavit support a finding of probable cause. We find significant, among other facts tying Shields to the e-groups in question, that Shields voluntarily registered for two e-groups that were devoted principally to sharing and collecting child pornography and in doing so used an e-mail address strongly suggestive of an interest in collecting child pornography.

### A. Registration with Multiple E-groups

Inasmuch as unchallenged portions of the search warrant affidavit demonstrated that Shields subscribed to not one, but two e-groups devoted largely to exchanging child pornography, this case is distinguishable from those on which he principally relies, Perez and Strauser, as in those cases the affidavits alleged that the putative defendant belonged only to the Candyman e-group. See Perez, 247 F. Supp. 2d at 462, 486; Strauser, 247 F. Supp. 2d at 1137. Moreover, this difference is not merely quantitative but also qualitative inasmuch as the Girls12-16 e-group's stated purpose, which repeatedly urged members to share images and photographs of "the young female in here [sic] finest form," was far more explicit than that of the Candyman group, compare app. at 79, ¶ 10 (Candyman proclamation), with app. at 82-83, ¶15 (Girls12-16 proclamation), and thus increased the fair probability that Shields downloaded available pornographic images such that evidence of his possession would be found.

The Court of Appeals for the Second Circuit recognized as much in Martin when it affirmed the denial of a Franks challenge a member of Girls12-16 brought, explaining that the e-group's "welcome message unabashedly announced that its

16

essential purpose was to trade child pornography," and that its very title "further made plain the site's focus was on minor girls." 426 F.3d at 75; see also id. at 77 ("At its core, the modus operandi of the Girls12-16 website was criminal, and that is determinative in this case."). We agree with the court's characterization of the Girls 12-16 group. Indeed, the Perez court recognized that the defendant's absence of membership in the Girls12-16 e-group set that case apart from other Candyman cases in which Franks challenges failed:

> The Coplan case is distinguishable, at least to an extent, because the search warrant affidavit there also noted that the defendant was a member of, in addition to the Candyman group, another Egroup apparently centered around disturbing child pornography, entitled 'Girls12-16.'

247 F. Supp. 2d at 486 (emphasis added).[6] Although Shields suggests that an individual such as himself simply might have "stumbl[ed] upon the sites," never to return after discovering their content, see Appellant's br. at 26, this possibility is remote given his registrations with these e-groups and his subsequent failure to cancel his memberships, one of which continued for more than a month and ended only when Yahoo shut down the e-group. See app. at 84, 86, ¶¶ 18, 24 (stating that Shields joined the Candyman e-group on January 2, 2001, and remained a member until February 6, 2001, when Yahoo terminated the group); accord United States v. Gourde, 440 F.3d 1065, 1070-71 (9th Cir. 2006) (en banc) (affirming denial of motion to suppress in child pornography prosecution and finding probable cause based on, among other things, the defendant's continuing membership on "Lolitagurls.com" website, which he maintained until the FBI shut down the site).[7]

---

[6]When it cited Coplan the Perez court was referring to a bench ruling in United States v. Coplan, No. CR 02-319 (E.D.N.Y. Aug 15, 2002). See Perez, 247 F. Supp. 2d at 485.

[7]Although the Candyman and Girls 12-16 e-groups at issue had been defunct for nearly nine months by the time the FBI filed its warrant application and supporting affidavit, Shields does not raise a staleness

17

## B. Suggestive E-mail Address

In addition to registering with multiple e-groups, we find significant Shields' self-selected e-mail moniker, "LittleLolitaLove," which carries much meaning in light of the unchallenged statements in the affidavit regarding the use of the term "Lolitas" in the parlance of child pornography. Specifically, the affidavit explained that "[s]ometimes individuals whose sexual objects are minors will refer to these images as "'Lolitas,'" a term whose etymology "comes from the titles of old child pornography magazines." App. at 88, ¶ 2(a).[8] Accordingly, Shield's use of the name "LittleLolitaLove" registering for multiple e-groups where such images were available and disseminated bolsters "a practical, commonsense decision" that Shields likely downloaded such images, and thus there existed "a fair probability that contraband or evidence of a crime [would] be found." Gates, 462 U.S. at 238-39, 103 S.Ct.

challenge. While we need not discuss the issue separately, we note that a staleness challenge would not have altered our decision. The determination of staleness requires more than simply counting the months between the facts relied on and the issuance of the warrant and is instead context dependant. See Harvey, 2 F.3d at 1322. We have noted that collectors of child pornography often store their material and rarely discard it. See id. at 1322-23 (citing with approval cases that dismissed staleness challenges and noted that collectors of child pornography rarely, if ever, dispose of their collections). Furthermore, we have recognized that information suggesting a "continuing offense" is more durable than information of discrete offenses. See United States v. Urban, 404 F.3d 754, 774 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance.").

[8]Of course, as noted by the district court, despite the appropriation of the term by child pornographers, the term actually has a more distinguished pedigree rooted in the literature of Vladimir Nabokov, and, before him, Heinz von Lichberg. Nonetheless, given the context of this case and the lack of any representation to the contrary, we reject the possibility that Shields' use of the name "LittleLolitaLove" was related to the texts of Nabokov or von Lichberg.

18

at 2332.  Moreover, Shields' use of this e-mail address undermines his present argument that the generalized information regarding the behavior of child pornography collectors has no bearing on probable cause absent "a foundation demonstrating that Shields has, in fact, exhibited that behavior." Appellant's br. at 25.  His choice of e-mail address supports a practical commonsense inference to the contrary.

Shields' use of the "LittleLolitaLove" e-mail address sets his case even further apart from Perez and Strauser than does his membership in two e-groups devoted largely to exchanging child pornography rather than one e-group as was true in those cases. In Perez, the defendant did not have a suggestive e-mail address or screen name.  See 247 F. Supp. 2d at 471 ("navajablade@aol.com").  While the defendant in Strauser had used mildly suggestive screen names, "EZ2bhrdnla" and "EZ2bhrdnSTL," 247 F. Supp. 2d at 1137, these names fell far short of "LittleLolitaLove," which pertains more precisely to child pornography and the criminal offense being investigated. Shields' use of "LittleLolitaLove" makes this case more like Froman, in which the Court of Appeals for the Fifth Circuit determined that certain of the defendant's screen names, namely "Littlebuttsue" and "Littletitgirly," "reflected his interest in child pornography."  355 F.3d at 890.  If anything, "LittleLolitaLove" with its express reference to "Lolitas," understood in this context as images of child pornography, can be characterized as more overtly suggestive of offenses related to collecting child pornography than the screen names deemed suggestive in Froman.

Finally, Shields' use of "LittleLolitaLove" to register for both the Candyman and Girls12-16 e-groups and his failure to cancel his memberships, further undermine any suggestion that he may have "stumbl[ed] upon the sites," never to return after discovering their content.  See Appellant's br. at 26.  Thus, Shields' choice of e-mail address largely eliminates a concern the district court articulated in Strauser "that one could not be sure that the site contained child pornography until after one had subscribed," 247 F. Supp. 2d at 1144, for the e-mail address Shields chose suggests that he likely collected or at least sought out such images.  Although Shields submits that his e-mail

19

address was simply "tasteless and sophomoric," Appellant's br. at 26, this is an understatement given the context in which he used it.

We have reviewed Shields' remaining arguments and find them to be without merit, and thus we need not discuss them at length. In particular, we find unavailing the suggestion that probable cause was lacking because the FBI could have determined with certainty whether he actually downloaded illegal images. Whether the FBI could have provided more information is not the benchmark, and other courts of appeals have rejected similar arguments. Gourde, 440 F.3d at 1073 n.5 ("[T]he benchmark is not what the FBI 'could have' done. An affidavit may support probable cause even if the government fails to obtain potentially dispositive information."); United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995) (holding that trial court "erred in focusing [its] Franks v. Delaware analysis on what the FBI could have learned with more investigation."). For purposes of our analysis, it is of no import that the FBI could have discovered more corroborating evidence, such as actual downloads, so long as the valid information it supplies satisfies the "fair probability" standard articulated in Gates. 462 U.S. at 238-39, 103 S.Ct. at 2332.[9]

## V. CONCLUSION

In sum, if there were a Candyman defendant well-suited to champion Fourth Amendment protections, clearly it is not Shields. In making a practical commonsense decision required by Gates, 462 U.S. at 238-39, 103 S.Ct. at 2332, we conclude that the untainted portions of Cutri's affidavit seeking the search warrant contained sufficient facts to support a finding that there was a fair probability that Shields possessed child pornography and that there was evidence of such possession in the locations

---

[9]In view of our result, we need not address the applicability of the good faith exception articulated in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405 (1984), that the government advances.

20

described in the affidavit.  The order of April 14, 2004, and the judgment of July 28, 2005, will be affirmed.

———————